## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| MONA GUNN, *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 21-1187 (RC) |
| | : | | |
| v. | : | Re Document No.: | 22, 23, 31 |
| | : | | |
| ISLAMIC REPUBLIC OF IRAN, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING PLAINTIFFS' MOTION FOR DEFAULT JUDGMENT; GRANTING PLAINTIFFS' MOTIONS TO SUBSTITUTE PARTIES

## I. INTRODUCTION

This case arises out of the October 12, 2000, terrorist bombing of the U.S.S. Cole ("the Cole") in Yemen, which killed 17 U.S. Navy sailors and injured dozens of others. *See* Compl. ¶¶ 5.2–5.7, ECF No. 1. This Court granted motions for default judgments against Iranian and Sudanese state defendants in prior cases arising out of the same incident. *See Flanagan v. Islamic Republic of Iran*, 87 F. Supp. 3d 93 (D.D.C. 2015); *Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63, 81 (D.D.C. 2023). Plaintiffs in the present case are fifty-eight immediate family members of United States Navy Sailors killed in the attack ("Surviving Family Plaintiffs"); thirty-four United States Navy Sailors stationed aboard the Cole who suffered physical injuries and emotional trauma because of the attack ("Navy Plaintiffs"); and twenty-two immediate family members of the Navy Plaintiffs who also experienced emotional trauma because of the

attack and its aftermath ("Immediate Family Plaintiffs").[1]  *See* Compl. ¶¶ 1.1–1.3; Ex. A to Pls.'
Mot. for Default J. ("Pls.' Mot."), ECF No. 31-1; *Flanagan*, 87 F. Supp. 3d at 98.  Plaintiffs
bring claims for intentional infliction of emotional distress ("IIED") and solatium under section
1605A of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C. §§ 1602 *et seq.*, and seek
punitive damages.  Compl. ¶¶ 7.1–7.8.  Defendant Islamic Republic of Iran has not entered an
appearance, so default was entered on March 10, 2022, s*ee* ECF No. 12, and Plaintiffs filed their
Motion for Default Judgment on December 15, 2023, ECF No. 31.  For the reasons set forth
below, the Court grants Plaintiffs' motion.

---

[1] Two Plaintiffs have passed away during the pendency of this action.  *See* Suggestion of
Death, ECF Nos. 20, 21.  For reasons discussed below, the Court grants Plaintiffs' motions to
substitute their estates as parties.

## II.  FACTUAL AND PROCEDURAL BACKGROUND[2]

### A.  Al-Qaeda[3]

"Al Qaeda is a worldwide terrorist network led by Osama Bin Laden," who founded the

network in Afghanistan in approximately 1990 "to serve as a base for like-minded Sunni Islamic

extremists." *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541, 548 (E.D. Va. 2007).  Al Qaeda has

"organized, executed, or inspired acts of terrorism around the world that killed or injured

thousands of innocent people, including the September 11, 2001, attacks on the United States,"

and has supported or trained terrorists in countries including Afghanistan, Bosnia, Chechnya,

Tajikistan, Somalia, Kosovo, the Philippines, Algeria, Eritrea, and, as relevant here, Yemen. *Id.*

"Bin Ladin saw himself as called 'to follow in the footsteps of the Messenger and to

communicate his message to all nations,' and to serve as the rallying point and organizer of a

---

[2] The Court adopts the factual background from *Taitt v. Islamic Republic of Iran*, 664 F. Supp. 3d 63, 82–85 (D.D.C. 2023).  The Federal Rules of Evidence authorize a court to take judicial notice of "adjudicative facts" "not subject to reasonable dispute" that are "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned," FED. R. EVID. 201(b), including "court records in related proceedings," *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010) (citations omitted).  Because of the number of individuals affected by terrorist attacks, and the associated "flood of cases that they generate," courts hearing FSIA claims "regularly" take judicial notice of factual findings from related cases.  *Goldstein v. Islamic Republic of Iran*, No. 16-cv-2507, 2018 WL 6329452, at *2 (D.D.C. Dec. 4, 2018) (citing *Rimkus*, 750 F. Supp. 2d at 171); *see also Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 58–59 (D.D.C. 2010); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 47 (D.D.C. 2009); *Estate of Heiser v. Islamic Republic of Iran*, 466 F. Supp. 2d 229, 262–63 (D.D.C. 2006).  In line with this approach, here, the Court takes judicial notice of facts found through extensive proceedings in *Flanagan* and another FSIA case arising out of the Cole bombing, *Rux v. Republic of Sudan*, 495 F. Supp. 2d 541 (E.D. Va. 2007).  In addition to accepting evidence from documents and affidavits, the Court in *Flanagan* held an evidentiary hearing at which five qualified experts testified.  *See Flanagan*, 87 F. Supp. 3d at 96–97.  The Court also took judicial notice of the findings from *Rux*, *see id.* at 96, in which the court considered 183 exhibits, including transcripts of expert depositions, a transcript of federal criminal proceedings against Osama Bin Laden, and various government reports concerning terrorism and the Cole bombing in particular, *see Rux*, 495 F. Supp. 2d at 543.

[3] The Court will use the spelling "Al-Qaeda" and "Osama Bin Laden," though cited materials may use slightly different spellings.

new kind of war to destroy America and bring the world to Islam." *Flanagan*, 87 F. Supp. 3d at 97–98 (citing *Rux*, 495 F. Supp. 2d at 48).

## B.  The Bombing

At approximately 8:30 a.m. on October 12, 2000, the Cole entered the Port of Aden, Yemen, to refuel.  *See Flanagan*, 87. F. Supp. 3d at 98 (citing *Rux*, 495 F. Supp. 2d at 544–45). The Navy used the Port of Aden as "the primary refueling stop for American ships during their 3,000-mile journey to the Arabian Gulf from the Mediterranean Sea" since 1999.  *Id.*  As of October 2000, the Cole, an Arleigh Burke Class Destroyer, had a crew of twenty-six officers and 270 enlisted personnel.  *See id.*  It "was the twenty-fifth Navy ship to stop in Aden Harbor for refueling over the previous nineteen months."  *Id.*  On the morning of the bombing,

> [a]t approximately 8:49 a.m., the Cole moored starboard side to Refueling Dolphin Seven, near the mouth of the harbor.  The ship began refueling at approximately 10:31 a.m.  At approximately 11:10 a.m., one of the sailors standing watch over the refueling noticed a small boat heading "fast and hard" toward the Cole from the direction of the city.  The boat, painted white with fire red trim, was about thirty-five feet long and six to seven feet wide and had a shallow V-hull.  It looked "brand new."  The boat was similar in size and shape to many other small vessels in the harbor, including the service craft that had been alongside the Cole.  The boat was manned by two males, both of whom appeared to be in their early thirties.  The two men slowed the boat as they approached the Cole, maneuvered it parallel to the ship and came down the port side headed aft.  As they did so, the two men in the boat were smiling, and waved to the crew. Some crew members returned the greeting.  Seconds later, the boat exploded.
>
> The explosion occurred between approximately 11:15 and 11:18 a.m., just as some of the crew was sitting down for lunch.  The blast ripped a thirty-two-by thirty-six-foot hole in the port side . . . .  Smoke, dust, and fuel vapors filled the air.  The main engine room, auxiliary machine room, and the dry provisions storeroom were flooded.  Several chambers, including the Crew and Chief Petty Officer's Galley, were structurally destroyed.  The blast and its after-effects killed seventeen Navy sailors, all of them American citizens.  Forty-two others were injured, some of them sustaining serious burns to their faces, hands and arms, as well as lacerations and fractures.

*Id.*  "The Cole plot was an Al Qaeda operation supervised directly by Bin Laden."  *Rux*, 495 F. Supp. 2d at 552.

### C.  Sudan

While Sudan is not a Defendant here, the Court briefly summarizes relevant facts concerning its relationship with Al-Qaeda and Iran and its participation in the bombing of the Cole, as they provide relevant context for understanding Iran's role in the bombing.  "In 1989, General Omar Bashir assumed the presidency of Sudan in a military coup that overthrew the elected government and converted Sudan into an Islamic Arab state."  *Flanagan*, 87 F. Supp. 3d at 98–99.  Hassan al Turabi, head of the Sudanese political party the National Islamic Front ("NIF"), orchestrated the coup, after which he was in power until late 1999.  *Id.* at 99.  Bin Laden lived in Sudan from 1991 to 1996, during which time he "agreed to help Turabi in the regime's ongoing war against African Christian separatists in southern Sudan, and also to invest his wealth in the country's infrastructure."  *Id.*  "In exchange, Sudan provided Bin Laden's group with a sanctuary within which it could freely meet, organize, and train militants for future operations."  *Id.*  The United States designated Sudan as a state sponsor or terrorism in 1993 but rescinded the designation effective December 14, 2020.  *See* Rescission of Determination Regarding Sudan, 85 Fed. Reg. 82565 (Dec. 18, 2020).  "Al-Qaeda's time in Sudan from 1991 through 1996 was invaluable to the development of the terrorist organization," and even after it "was expelled from Sudan in 1996, Sudan continue[d] to be a safe harbor . . .  allowing the organization to plan more freely."  *Flanagan*, 87 F. Supp. 3d at 100–01 (quotation omitted).

### D.  Iran

Starting in the early 1990s, Iran, Sudan, and Al-Qaeda began to coordinate "against their common enemies, the United States and Israel."  *Id.* at 103 (quotation and citations omitted).  "Although Iranians are Shias, they nevertheless supported the terrorist activities of Bin Laden, a Suni, because of their mutual hatred of 'the infidels in the United States.'"  *Id.* (citation

omitted).[4]  This "tripartite front" allowed Al-Qaeda "the opportunity to build ties with Iranian officials, Hizballah, and other terrorist organizations dedicated to attacking United States personnel, military targets, and citizens in the Middle East."  *Id.*  "[T]he parties agreed that 'experience from Hizballah and Iran should be transferred to new nations/extremist groups who lack this expertise . . . [in order to] allow [Al-Qaeda] members to gain the necessary experience in terrorist operations.'"  *Id.* (citation omitted).  The United States designated Iran a state sponsor of terrorism in 1984, *see* U.S. Dep't of State, *Determination Pursuant to Section 69(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836 (Jan. 23, 1984), and the designation remains in place today, *see* U.S. Dep't of State, State Sponsors of Terrorism, https://www.state.gov/state-sponsors-of-terrorism/ (last visited July 29, 2024).

Iran often used "both its own people and facilities as well as those of its close ally Hizballah" to support terrorist operations, including Al-Qaeda.  *Flanagan*, 87 F. Supp. 3d at 103–04 (internal quotation omitted).  "Iranian '[s]upport for militant and terrorist groups [was] almost always done via Iran's Ministry of Intelligence and Security (MOIS) or the Islamic Revolutionary Guard Corps (IRGC), a parallel military force that [was] tasked with protecting Iran's revolution at home and spreading it abroad, among other duties.'"  *Id.* (citation omitted).  Iran "used its intelligence services extensively to facilitate and conduct terrorist attacks," and intelligence officers "used the diplomatic pouch for conveyance of weapons and finances for terrorist groups."  *Id.* (internal quotations omitted).  MOIS "facilitated the movement of [Al-Qaeda] operatives in Iran and provided them with documents, identification cards, and passports," and negotiated the release of its operatives.  *Id.*  Iran has provided training and "large

---

[4] Iran's support for Al-Qaeda maintained "even in situations where Iran [was] also supporting those fighting Al-Qaeda."  *Flanagan*, 87 F. Supp. 3d at 105.

sums of money" to Al-Jihad, "an Islamic terrorist group controlled by Bin Laden," and "intense secret contacts have taken place between top Iranian intelligence officers, Bin Laden, and Al-Zawaheri," one of Al Jihad's leaders. *Id.* at 105 (citation omitted). Furthermore, "Iran directly trained Al-Qaeda operatives," and also supported Hizballah, "which in turn provided training for Al-Qaeda." *Id.* at 106. Finally, "Iran has long provided material support to Al-Qaeda in the form of safe passage and facilitation of travel," including by "permit[ing] at least some Al-Qaeda members and leaders to cross Iranian territory, without stamping their passports" and by letting Al-Qaeda "establish a series of guest houses for its fighters making the long journey through [Iranian] territory."[5] *Id.* at 107 (citation omitted). Such travel assistance was "invaluable" in helping operatives to evade authorities, facilitating recruitment and training, and simplifying communication and coordination "among the far-flung strands of the global jihad of which [Al-Qaeda] is a part." *Id.* at 107–08 (citations omitted).

"At the time of the bombing of the Cole, the links between [Iran] and Bin Laden and Al-Qaeda were firmly established." *Id.* at 108. As the *Flanagan* court summarized:

> Iran was actively tied to al-Qa'ida in the years when the attack on USS Cole was being planned and when it was executed. The 1999 State Department report on terrorism that year noted Iran's support in training and logistics for extremist groups like al-Qa'ida in the Gulf, among other activities. Iran reportedly contributed to helping al-Qa'ida set up a network in Yemen: Zawahiri wrote to thank the Iranians for their assistance. Ali Abdul Aziz Ali, identified as one of the USS Cole bombing masterminds, was radicalized in Iran after hearing Ramzi Yousef, who masterminded the 1993 World Trade Center bombing, speak about jihad there (the exact date is unclear). Al-Qa'ida facilitator and financier Muhsin al-Fadhli is Iran-based and he helped finance the 2002 attack on MV Limburg off Yemen–many of those involved in Al Qaeda's operations in Yemen were also involved in the Limburg attack. In addition, initial reports indicated the bomb used for the USS Cole attack bears similarities to shaped bombs designed by Hizballah, and it

---

[5] Allowing passage through Iran without stamping operatives' passports "was very useful for al-Qaeda to pass through Iran in order to get to the outside world, because if they showed up with Pakistani visas on their passports, then the Saudis or United Arab Emirate authorities were suspicious." *Flanagan*, 87 F. Supp. 3d at 107.

> is possible that al-Qa'ida learned such techniques when training in Lebanon in the early
> 1990s.
> . . .
> Iran supported al-Qa'ida as an organization and made it stronger overall, and this made
> al-Qa'ida better able to carry out terrorist attacks such as the USS Cole bombing.  This
> support is not consistent or unqualified, but over the years it has helped make al-Qa'ida a
> formidable organization.

*Id.* (citation omitted).  "As a result of Iran's complicity, it is likely that Abd Rahim Hussayn

Muhammad al Nashiri, one of the masterminds of the attack on the Cole, travelled through Iran

when moving between Yemen and Afghanistan both before and after the bombing."  *Id.*

### E.  Plaintiffs

All three classes of Plaintiffs seek relief on a theory of IIED.  *See* Compl. ¶ 7.2.  The

thirty-four Navy Plaintiffs seek pain and suffering damages, *see id.* at ¶ 8.3(b), while the

Surviving Family Plaintiffs and Immediate Family Plaintiffs seek solatium damages, *see id.* at ¶¶

8.2(a), 8.3(c).  In addition, Plaintiffs seek punitive damages, prejudgment interest, costs and

expenses, and attorney's fees.  *See id.* at ¶¶ 8.2–8.3.  The injuries alleged by each Plaintiff are

described *infra* Section IV.E.2.

### III.  LEGAL FRAMEWORK

### A.  Default Judgment

Federal Rule of Civil Procedure 55 sets forth a two-step process for a party seeking

default judgment: entry of default, followed by entry of default judgment.  *See* Fed. R. Civ. P.

55; *see also Int'l Painters & Allied Trades Indust. Pension Fund v. Rose City Glass Co.*, 729 F.

Supp. 2d 336, 338 n.3 (D.D.C. 2010) (citing Fed. R. Civ. P. 55; *Eitel v. McCool*, 782 F.2d 1470,

1471 (9th Cir. 1986); *Meehan v. Snow*, 652 F.2d 274, 276 (2d Cir. 1981)).  First, after a

defendant has failed to plead or otherwise defend against an action, the plaintiff may request that

the clerk of the court enter default against that defendant.  *See* Fed. R. Civ. P. 55(a).  Second,

following the clerk's entry of default, and where the plaintiff's claim is not for a sum certain, Rule 55(b)(2) permits the plaintiff to apply to the court for entry of default judgment.  *See* FED. R. CIV. P. 55(b)(2).  By providing for a two-step process, Rule 55 provides the defendant an opportunity to move the court to set aside the default before the court enters default judgment. *See* FED. R. CIV. P. 55(b)–(c).

Although entry of default judgment may at times be appropriate, it is "not automatic." *Braun v. Islamic Republic of Iran*, 228 F. Supp. 3d 64, 74 (D.D.C. 2017) (quoting *Mwani v. bin Laden*, 417 F.3d 1, 6 (D.C. Cir. 2005)) (footnote omitted)).  Because "strong policies favor the resolution of disputes on their merits," the court "normally" must view the default judgment as "available only when the adversary process has been halted because of an essentially unresponsive party." *Jackson v. Beech*, 636 F.2d 831, 836 (D.C. Cir. 1980) (quoting *H. F. Livermore Corp. v. Aktiengesellschaft Gebruder Loepfe*, 432 F.2d 689, 691 (D.C. Cir. 1970) (per curiam)).  Even if a defendant appears "essentially unresponsive," *id.*, the court still has an "affirmative obligation" to ensure that it has subject matter jurisdiction over the suit, *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1092 (D.C. Cir. 1996).  The court must also "satisfy itself that it has personal jurisdiction before entering judgment against an absent defendant." *Mwani*, 417 F.3d at 6.  "Although the plaintiffs retain 'the burden of proving personal jurisdiction,'" "[i]n the absence of an evidentiary hearing," plaintiffs can "satisfy that burden with a prima facie showing." *Braun*, 228 F. Supp. 3d at 74 (internal quotation marks omitted) (quoting *Mwani*, 417 F.3d at 6–7).  To make the required prima facie showing, plaintiffs may rely on "their pleadings, bolstered by such affidavits and other written materials as they can otherwise obtain." *Mwani*, 417 F.3d at 7.

## B.  Evidentiary Showing Required by the FSIA

A court addressing a FSIA claim can enter default judgment against a foreign state only if "the claimant[s] establish[] [their] right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *see also Roeder v. Islamic Republic of Iran*, 333 F.3d 228, 232 (D.C. Cir. 2003) ("The court . . . has an obligation to satisfy itself that plaintiffs have established a right to relief.").  This statutory standard mirrors the default judgment standard of Federal Rule of Civil Procedure 55(d).  *See Hamen v. Islamic Republic of Iran*, 401 F. Supp. 3d 85, 90 (D.D.C. 2019) (citing *Owens v. Republic of Sudan*, 864 F.3d 751, 785 (D.C. Cir. 2017), *vacated and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020)); *Hill v. Republic of Iraq*, 328 F.3d 680, 683 (D.C. Cir. 2003)).  The "FSIA leaves it to the court to determine precisely how much and what kinds of evidence . . . plaintiff[s] must provide, requiring only that it be 'satisfactory to the court.'"  *Han Kim v. Democratic People's Republic of Korea*, 774 F.3d 1044, 1047 (D.C. Cir. 2014) (quoting 28 U.S.C. § 1608(e)).  A court making a determination about the evidence required must bear in mind Congress's statutory purpose in enacting a private right of action in section 1605A of the FSIA: to "compensate[] the victims of terrorism [and thereby] punish foreign states who have committed or sponsored such acts and deter them from doing so in the future."  *Id.* at 1048 (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 88–89 (D.C. Cir. 2002)).  In parsing the evidence that plaintiffs offer, "[c]ourts may rely on uncontroverted factual allegations that are supported by affidavits."  *Roth v. Islamic Republic of Iran*, 78 F. Supp. 3d 379, 386 (D.D.C. 2015) (citing *Rimkus v. Islamic Republic of Iran*, 750 F. Supp. 2d 163, 171 (D.D.C. 2010)).  "Uncontroverted factual allegations that are supported by admissible evidence are taken as true."  *Braun*, 228 F. Supp. 3d at 74–75 (citing *Roth*, 78 F. Supp. 3d at 386; *Gates v. Syrian Arab Republic*, 580 F. Supp. 2d 53, 63 (D.D.C. 2008), *aff'd*,

646 F.3d 1 (D.C. Cir. 2011)); *see also Estate of Botvin ex rel. Ellis v. Islamic Republic of Iran*,

510 F. Supp. 2d 101, 103 (D.D.C. 2007) (citing *Greenbaum v. Islamic Republic of Iran*, 451 F.

Supp. 2d 90, 94–95 (D.D.C. 2006)).

## IV.  ANALYSIS

Before considering liability or damages in a FSIA case, the Court must first confirm it

has subject matter jurisdiction over Plaintiffs' claims and personal jurisdiction over Iran.[6]  *See*

*Barry v. Islamic Republic of Iran ("Barry I")*, 410 F. Supp. 3d 161, 172 (D.D.C. 2019).  For the

reasons set forth below, the Court finds that it has original jurisdiction over this suit pursuant to

the FSIA, that it has personal jurisdiction over Iran, and that Plaintiffs have established liability

and are entitled to damages.

### A.  Subject Matter Jurisdiction

Subject to an adequate showing by Plaintiffs, the FSIA waives Iran's sovereign immunity

and grants this Court subject matter jurisdiction over this suit.

#### 1.  Waiver of Sovereign Immunity

The pertinent jurisdictional question is whether the FSIA's "terrorism exception,"

28 U.S.C. § 1605A, applies such that Defendant Iran—a foreign state—is "not entitled to

immunity," 28 U.S.C. § 1330(a), and Plaintiffs may pursue their claims before this Court.  *See*

*Barry I*, 410 F. Supp. 3d at 172–73 (summarizing background sovereign immunity principles).

The terrorism exception establishes "that a foreign state is not immune in 'any case' in which

'money damages are sought against a foreign state for personal injury or death that was caused

---

[6] A limitations period applies to private actions brought under the FSIA's terrorism exception to foreign sovereign immunity.  *See* 28 U.S.C. § 1605A(b).  However, this statute of limitations is "not jurisdictional" and the Court "lack[s] authority or discretion to *sua sponte* raise the terrorism exception's statute of limitations" on behalf of an entirely absent defendant. *Maalouf v. Islamic Republic of Iran*, 923 F.3d 1095, 1108, 1114–15 (D.C. Cir. 2019).

by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Id.* at 173 (quoting 28 U.S.C. § 1605A). A plaintiff in a suit brought under the FSIA "'bears [the] initial burden of production to show an exception to immunity, such as § 1605A, applies,' whereupon, if the defendant fails to appear, 'jurisdiction attaches.'" *Id.* (quoting *Owens*, 864 F.3d at 784).

In addition, the terrorism exception applies only if two prerequisites are met: (1) the foreign state was designated as a "state sponsor of terrorism at the time of the act," and "remains so designated when the claim is filed," 28 U.S.C. § 1605A(a)(2)(A)(i)(I), and (2) the "claimant or the victim was" a national of the United States, a member of the armed forces, or "otherwise an employee of the Government of the United States[] or . . . an individual performing a contract awarded by the United States Government, acting within the scope of the employee's employment" at the time of the act, 28 § 1605A(a)(2)(A)(ii). *See also Mohammadi v. Islamic Republic of Iran*, 782 F.3d 9, 14 (D.C. Cir. 2015); *Schertzman Cohen v. Islamic Republic of Iran*, No. 17-1214 (JEB), 2019 WL 3037868, at *3 (D.D.C. July 11, 2019). The Court will first consider whether these threshold requirements are met and then consider whether this suit falls within the terrorism exception's waiver of sovereign immunity, thereby conferring subject matter jurisdiction.

*a. Requirements for a Claim to be Heard Under Section 1605A*

The Court finds that section 1605A's prerequisites are met. First, Iran was designated as a state sponsor of terrorism in 1984, *see* U.S. Dep't of State, *Determination Pursuant to Section 69(i) of the Export Administration Act of 1979—Iran*, 49 Fed. Reg. 2836 (Jan. 23, 1984), and has remained so designated ever since, *see* U.S. Dep't of State, *State Sponsors of Terrorism*, https://www.state.gov/state-sponsors-of-terrorism/ (last visited July 29, 2024). Thus, Plaintiffs'

claims for injuries suffered as a result of the Cole bombing in 2000 satisfy the first prerequisite under section 1605A(a)(2)(A)(i)(I).

Plaintiffs have also satisfied the second prerequisite under section 1605A(a)(2)(A)(i)(II). Again, the terrorism exception applies only if the "claimant or victim was," at the time of the act, a national of the United States, a member of the armed forces, or working as "an employee of the Government of the United States" or "performing a contract awarded by the United States Government" and, in either case, "acting within the scope of the employee's employment." § 1605A(a)(2)(A)(ii). The Complaint alleges that each Plaintiff is a U.S. Citizen, and Plaintiffs' affidavits attest to their citizenship status. *See* Compl. ¶¶ 2.1, 3.1–4.58; Exs. C–AAA to Pls.' Mot., ECF Nos. 31-3–36-7. The Court accepts Plaintiffs' claims to U.S. citizenship. Thus, all Plaintiffs have met the threshold requirements for a claim to be heard under section 1605A.

### b. Section 1605A's Waiver of Sovereign Immunity

With these threshold requirements met, the next jurisdictional question is whether Plaintiffs have met each of the requirements enumerated in section 1605A itself. "[A]n exception to sovereign immunity exists for a foreign defendant when the FSIA claimant seeks [1] 'money damages' [2] 'against a foreign state' for [3] 'personal injury or death that [4] was caused by [5] an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources for such an act.'" *Barry I*, 410 F. Supp. 3d at 174 (quoting 28 U.S.C. § 1605A(a)(1) (alterations added)); *see also Oveissi v. Islamic Republic of Iran* ("*Oveissi III*"), 879 F. Supp. 2d 44, 50–51 (D.D.C. 2012); *Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 32 (D.D.C. 2012). Each of these prongs is met here. Because Plaintiffs seek money damages in the form of compensatory and punitive damages against Defendant Iran, *see* Compl. ¶ 7.1–7.8; Proposed Damages Chart, Ex. B to Pls.' Mot., ECF No. 31-2, prongs one and

two are satisfied.  Regarding prong three, the Court finds "satisfactory evidence" of Plaintiffs'

personal injuries in their affidavits and supporting documentation, as summarized *infra* Section

IV.E.2, which lay out in detail all manner of physical and emotional injuries suffered by

Plaintiffs.  28 U.S.C. § 1608(e); *see Barry I*, 410 F. Supp. 3d at 174 ("Plaintiffs' pleadings and

declarations . . . satisfy prong three").  Regarding prong four, Plaintiffs' pleadings and the

attached affidavits and supporting materials establish that the Cole bombing caused these

injuries.  Finally, regarding prong five, the Court adopts the finding from *Flanagan* that Iran,

"through the provision of material support and resources (the financial support, support for

training, and facilitation of travel) to Bin Laden and Al-Qaeda, facilitated the planning and

execution of the attack on the Cole," *Flanagan*, 87 F. Supp. 3d at 115; *see* 28 U.S.C. §

1605A(h)(3) (providing, in relevant part, that "'material support or resources' means any

property, tangible or intangible, or service" (referencing 18 U.S.C. § 2339A)).

Accordingly, all of section 1605A's subject matter jurisdictional requirements are met,

and Iran's sovereign immunity is waived with respect to Plaintiffs' claims.

### B.  Personal Jurisdiction

The Court next explores whether Plaintiffs have met the FSIA's separate procedural

requirements regarding personal jurisdiction.  "Personal jurisdiction exists over a non-immune

sovereign so long as service of process has been made under section 1608 of the FSIA."  *Estate*

*of Heiser v. Islamic Republic of Iran* ("*Heiser I*"), 466 F. Supp. 2d 229, 255 (D.D.C. 2006)

(citation omitted); 28 U.S.C. § 1330(b) ("[P]ersonal jurisdiction over a foreign state shall exist as

to every claim for relief over which the district courts have jurisdiction . . . where service has

been made under section 1608 of this title.").  Section 1608 provides four ways to effect service:

[1] "special arrangement for service between the plaintiff and the foreign state or political

subdivision;" [2] "in accordance with an applicable international convention on service of judicial documents;" [3] in cases where the first two methods do not suffice to effect service, "by sending a copy of the summons and complaint and a notice of suit" including translations "into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned," or [4] if the third method also fails,

> by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services—and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted.

28 U.S.C. § 1608(a).

Neither option one nor option two applies here, as Plaintiffs do not have a "special arrangement" with Iran and there is no applicable treaty.  Pls.' Mot. at 8.  Plaintiffs therefore attempted to effectuate service using the third method.  *See id.*; Aff. Req. Foreign Mailing, June 10, 2021, ECF No. 4.  This attempt was unsuccessful, so Plaintiffs resorted to the fourth method, *see* Aff. Req. Foreign Mailing, Aug. 23, 2021, ECF No. 7; Certificate of Mailing, Sep. 2, 2021, ECF No. 9, under which service was effected on the Iran Ministry of Foreign Affairs on January 5, 2022, *see* Return of Serv., Mar. 2, 2022, ECF No. 10.  Thus, Plaintiffs have satisfied section 1608's service of process requirements, and the Court may exercise personal jurisdiction over Iran.

## C. Plaintiffs' Eligibility to Bring Section 1605A Claims

A few final threshold matters remain before assessing liability: (1) whether the estates of

deceased plaintiffs may substitute into this action; (2) whether estates of deceased individuals

have standing; and (3) whether half-siblings, stepsiblings, and stepparents may sue.

### 1. Substitution of Legal Representatives

Before addressing the standing of the various estates, the Court addresses a preliminary

issue regarding the legal representatives pursuing some of these claims.  Plaintiffs filed motions

to substitute for two Plaintiffs for the estates of now-deceased Plaintiffs under Federal Rule of

Civil Procedure 25(a).[7]  Pls.' Mot. Substitute ("Subs. Mot."), ECF Nos. 22–23.  "A deceased

individual" such as these Plaintiffs "cannot serve as the real party in interest in a civil action."

*Mohammadi v. Islamic Republic of Iran*, 947 F. Supp. 2d 48, 54 n.2 (D.D.C. 2013) (citing Fed.

R. Civ. P. 25(a)(1)).  If, as here,

> a party dies during litigation, Rule 25 allows for the substitution of a proper party.
> It states that once a formal suggestion of death is made on the record, a party or the
> decedent's successor or representative has 90 days in which to file a motion for
> substitution of a proper party.

*Worley v. Islamic Republic of Iran*, 75 F. Supp. 3d 311, 333 (D.D.C. 2014).  Plaintiffs filed both

their suggestions of death and motion to substitute on the same day.  Even if they had not, "the

Court may, *sua sponte*, substitute an appropriate person, such as a close relative, as a

representative of the decedent's estate."  *Bluth v. Islamic Republic of Iran*, 203 F. Supp. 3d 1, 22

n.17 (D.D.C. 2016) (quoting *Mohammadi*, 947 F. Supp. 2d at 55).  Moreover, as the *Mohammadi*

court explained, Federal Rule of Civil Procedure 25(a)(1) itself provides that "[i]f a party dies

---

[7] These individuals are (1) Jaime Owens, Compl. ¶ 3.54, for whom Plaintiffs seek to
substitute her daughter, Isabella Beasley, Pls.' Mot. Substitute, ECF No. 22; (2) LeRoy Parlett,
Compl., ¶ 3.35, for whom Plaintiffs seek to substitute Etta Parlett, Pls.' Mot. Substitute, ECF No.
23.

and the claim is not extinguished, the court may order substitution of the proper party."  947 F. Supp. 2d at 54 n.2 (citing Fed. R. Civ. P. 25(a)(1)).  With these principles in mind, the Court grants Plaintiffs' motions to substitute legal representatives for the now-deceased Plaintiffs.

### 2.  Standing of Estates

The Court will next consider whether the three estates in this action have standing. "When, such as here, an estate-plaintiff brings an action under [the] FSIA's private cause of action, the plaintiff must first establish the estate's standing, or '[its] power . . . to bring and maintain legal claims.'"  *Cohen v. Islamic Republic of Iran*, 238 F. Supp. 3d 71, 85 (D.D.C. 2017) (second alteration in original) (quoting *Taylor v. Islamic Republic of Iran*, 811 F. Supp. 2d 1, 12–13 (D.D.C. 2011)).  The standing of the estate is a "threshold question" that is "governed by the law of the state which also governs the creation of the estate."  *Worley*, 75 F. Supp. 3d at 333 (quoting *Taylor*, 811 F. Supp. 2d at 12); *see also Lelchook v. Syrian Arab Republic* ("*Lelchook II*"), No. 16-cv-1550 (RC), 2019 WL 2191177, at *1 (D.D.C. Mar. 25, 2019) (quoting *Taylor*, 811 F. Supp. 2d at 12).

Plaintiffs have provided uncontroverted evidence regarding which state's law governs the creation of each of the estates bringing claims in this suit.  *See* Subs. Mot.; Compl. ¶¶ 3.35, 3.54, 4.37.  Specifically, three estates were created under Florida, Maryland, and North Carolina law, respectively.  *See* Subs. Mot.; Compl. ¶ 4.38.  The Court next considers the applicable laws of each of these states.  For the reasons set forth below, it has been established that the individuals who serve as legal representatives for the estates have standing under the governing statutes and/or law of inheritance for each of the respective jurisdictions.

#### a.  Estate Governed by Florida Law

The estate of Jaime Owens is governed by Florida law and is associated with a United States Navy Sailor killed in the attack on the Cole.  *See* Subs. Mot., ECF No. 22; Compl. ¶ 3.54. Florida law provides that "No cause of action dies with the person.  All causes of action survive and may be commenced, prosecuted, and defended in the name of the person prescribed by law." Fla. Stat. Ann. § 46.021 (1997).  "The administrator of a decedent's estate" may "maintain a survival action on behalf of the deceased under Section 46.021."  *Martin v. United Sec. Servs., Inc.*, 314 So. 2d 765, 767 (Fla. 1975).  As such, Jaime Owens's estate has standing to assert a solatium claim.

#### b.  Estate Governed by Maryland Law

The estate of LeRoy Parlett is governed by Maryland law and is associated with a United States Navy Sailor killed during the attack on the Cole.  *See* Subs. Mot., ECF No. 23; Compl. ¶¶ 3.34–35.  Under Maryland law, an executor "may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted."  Md. Code Ann., Est. & Trusts § 7-401(y).  Except for causes of action for slander, "a cause of action at law, whether real, personal, or mixed, survives the death of either party."  Md. Code Ann., Cts. & Jud. Proc. § 6-401(a).  LeRoy Parlett's estate therefore has standing to assert a solatium claim.

#### c.  Estate Governed by North Carolina Law

The estate of Rubin Smith is governed by North Carolina law and is associated with a United States Navy Sailor injured during the attack on the Cole.  Compl. ¶ 4.37–38.  Under North Carolina law, "[u]pon the death of any person, all demands whatsoever, and rights to

prosecute or defend any action or special proceeding, existing in favor of or against such person

. . . shall survive to and against the personal representative or collector of the person's estate."

N.C. Gen. Stat. Ann. § 28A-18-1(a) (2012).  Rubin Smith's estate therefore has standing to assert

a solatium claim, as well.

### 3.  Half-Siblings and Step Relatives

Although courts evaluating FSIA cases in this district have "adopted the strict meaning of

'immediate family,' defined as one's spouse, parents, siblings, and children," *Estate of Heiser v.*

*Islamic Republic of Iran ("Heiser II")*, 659 F. Supp. 2d 20, 28 (D.D.C. 2009) (citations omitted),

the D.C. Circuit has recognized that "immediate family members" can include "members of the

victim's household" who are "viewed as the functional equivalents of immediate family

members," *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 337 (D.C. Cir. 2003).  Accordingly,

the Court will award half-siblings, step-siblings, and step-parents solatium damages to the extent

they were "treated like" a sibling or parent or acted as the "functional equivalent" thereof.  *Fritz*

*v. Islamic Republic of Iran*, 324 F. Supp.3d 54, 59–60 (D.D.C. 2018) (quoting *Valore v. Islamic*

*Republic of Iran*, 700 F. Supp. 2d 52, 80 (D.D.C. 2010)); *see also Cabrera v. Islamic Republic of*

*Iran*, No. 19-cv-3835, 2022 WL 2817730, at *42 (D.D.C. July 19, 2022) (applying the same

"functional equivalent" test); *Force v. Islamic Republic of Iran*, 617 F. Supp. 3d 20, 38 (D.D.C.

2022) (same).

### D.  Liability

With these preliminary inquiries settled, the Court turns to the question of liability.

"[A]lthough section 1605A creates a private right of action for claimants who meet its other

requirements, a FSIA plaintiff must further prove a theory of liability to establish a claim for

relief that entitles them to damages."  *Barry I*, 410 F. Supp. 3d at 176 (cleaned up); *see also*

*Owens*, 864 F.3d at 807 ("[T]he question [of] whether a statute withdraws sovereign immunity is 'analytically distinct' from whether a plaintiff has a cause of action." (citing *FDIC v. Meyer*, 510 U.S. 471, 484 (1994); *United States v. Mitchell*, 463 U.S. 206, 218 (1983))).[8]  Plaintiffs who seek relief in section 1605A actions "'generally' turn to 'the lens of civil tort liability'" to articulate the "justification for such recovery."  *Barry I*, 410 F. Supp. 3d at 176 (quoting *Rimkus*, 750 F. Supp. 2d at 175–76); *see also, e.g.*, *Schertzman Cohen*, 2019 WL 3037868, at *5 (discussing *Valore* and *Rimkus*).  "Based on the D.C. Circuit's guidance, district courts in this jurisdiction 'rely on well-established principles of law, such as those found in the Restatement (Second) of Torts . . . ' to define the elements and scope of these theories of recovery."  *Worley*, 75 F. Supp. 3d at 335 (quoting *Oveissi III*, 879 F. Supp. 2d at 54); *see also Fraenkel v. Islamic Republic of Iran*, 892 F.3d 348, 353 (D.C. Cir. 2018) (citing *Bettis*, 315 F.3d at 333) ("The courts are not authorized to craft a body of federal common law in deciding FSIA terrorism exception cases.  However, a district court may rely on well-established statements of common law.").

Plaintiffs here seek relief for IIED.[9]  *See* Compl. ¶¶ 7.1–7.3.  "Under general principles of tort law, a defendant is liable for IIED if its 'extreme and outrageous conduct intentionally or

---

[8] As indicated in the Court's jurisdictional analysis *supra* Section IV.A.1.a, all Plaintiffs have demonstrated that they are United States citizens.  As "national[s] of the United States," they are eligible to bring suit under the private right of action established under 18 U.S.C. § 1605A(c).

[9] While Plaintiffs further claim solatium, *see* Compl. ¶ 7.4, "the law confers only one recovery, irrespective of the multiplicity of parties whom or theories which the plaintiff pursues," *Kassman v. Am. Univ.*, 546 F.2d 1029, 1034 (D.C. Cir. 1976).  Still, because "[s]olatium claims under the FSIA are functionally identical to claims for [IIED]," *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 27 (D.D.C. 2014), solatium damages are reflected in the compensatory damages awards laid out below.  *See Harrison v. Republic of Sudan*, 882 F. Supp. 2d 23, 47 n.12 (D.D.C. 2012) (explaining that while the spouses of the injured plaintiffs allege solatium in addition to IIED, because the two are "indistinguishable" the court "only considers the IIED claim and awards appropriate damages (also known a[s] 'solatium damages') . . . . "), *rev'd on other grounds by Republic of Sudan v. Harrison*, 587 U.S.1 (2019).

recklessly causes severe emotional distress' to a plaintiff." *Barry I*, 410 F. Supp. 3d at 177

(citing RESTATEMENT (SECOND) OF TORTS § 46(1) (1965)).  "In terrorism actions brought

pursuant to section 1605A of the FSIA, the requirement of presence at the time of the incident is

waived." *Flanagan*, 87 F. Supp. 3d at 115 (citing *Valore*, 700 F. Supp. 2d at 80).

Having reviewed the evidence presented in *Flanagan*, *see Rimkus*, 750 F. Supp. 2d at

171–72, the Court agrees with its finding that satisfactory evidence establishes that Iran's

provision of financial, training, and travel support to Bin Laden and Al-Qaeda "facilitated the

planning and execution of the attack on the Cole." *Flanagan*, 87 F. Supp. 115–16; *see also Taitt*,

664 F. Supp. 3d at 90 (same); *Spencer v. Islamic Republic of Iran*, 71 F. Supp. 3d 23, 25 (D.D.C.

2014) (taking judicial notice of evidence from previous case concerning the same bombing to

establish liability).  The intent requirement is also met because "acts of terrorism are by their

very definition extreme and outrageous and intended to cause the highest degree of emotional

distress." *Belkin v. Islamic Republic of Iran*, 667 F. Supp. 2d 8, 22 (D.D.C.2009) (citing *Stethem

v. Islamic Republic of Iran*, 201 F.Supp.2d 78, 89 (D.D.C.2002)).  In addition, Plaintiffs'

affidavits and supplementary materials constitute satisfactory evidence that they in fact suffered

severe emotional distress.  *See infra* Section IV.E.2.  Thus, applying general IIED tort law

principles in the FSIA context, the Court concludes that Plaintiffs have established Iran's

liability.

### E.  Damages

"The FSIA's private cause of action permits plaintiffs to seek 'economic damages,

solatium, pain and suffering, and punitive damages.'" *Barry I*, 410 F. Supp. 3d at 179 (quoting

28U.S.C. § 1605A(c)).[10]  Plaintiffs seek compensatory and punitive damages with prejudgment interest.  *See* Compl. ¶¶ 8.2(a)–(c), 8.3(e); Pls.' Mot. at 4.

### 1. Compensatory Damages under the FSIA

As other courts addressing similar suits under the FSIA have observed, "it is undeniably difficult to assess the amount of compensatory damages for the pain and suffering of surviving victims of terrorist attacks, especially where severe mental anguish is involved." *Valencia v. Islamic Republic of Iran*, 774 F. Supp. 2d 1, 14 (D.D.C. 2010) (internal quotation marks omitted) (quoting *Brewer*, 664 F. Supp. 2d at 57).  Because of the importance of ensuring "that individuals with similar injuries receive similar awards," *Peterson v. Islamic Republic of Iran*, 515 F. Supp. 2d 25, 54 (D.D.C. 2007), courts in this jurisdiction confronting FSIA claims have developed a framework for the calculation of compensatory damages, *see Valore*, 700 F. Supp. 2d at 83–84.  Although the so-called *Heiser* framework, first set forth in *Heiser I*, 466 F. Supp. 2d 229, is non-binding, it provides baseline figures and a basic methodology by which to ascertain the "appropriate measure of damages" both for directly injured victims and for "the family members of victims who died" or were injured in a terrorist attack.  *Lelchook v. Syrian Arab Republic ("Lelchook III")*, No. 16-cv-1550, 2019 WL 4673849, at *4 (quoting *Peterson*, 515 F. Supp. 2d at 51, 54); *see also, e.g.*, *Valore*, 700 F. Supp. 2d at 85–86 (noting "strong

---

[10] The FSIA requires plaintiffs to make an adequate evidentiary showing before a court may award damages: "To obtain damages against defendants in a FSIA action, the plaintiff must prove that the consequences of the defendants' conduct were 'reasonably certain' (i.e., more likely than not) to occur, and must prove the amount of the damages by a 'reasonable estimate' consistent with this [Circuit's] application of the American rule on damages.'" *Salazar v. Islamic Republic of Iran*, 370 F. Supp. 2d 105, 115–16 (D.D.C. 2005) (quoting *Hill*, 328 F.3d at 681); *see also Wultz*, 864 F. Supp. 2d at 37.  For the reasons discussed previously, Plaintiffs have established that Iran intended to injure the sailors aboard the Cole when it provided material support and resources to Bin Laden and Al-Qaeda.  Thus, Plaintiffs have carried their burden to show that the consequences of Iran's act were reasonably certain, and the sole question for this Court is the damages amount.

precedential support" for the framework); *Brewer v. Islamic Republic of Iran*, 664 F. Supp. 2d 43, 57–58 (D.D.C. 2009); *Heiser II*, 659 F. Supp. 2d at 27 n.4.

Under the *Heiser* framework, a court begins with baseline amounts and may adjust upward or downward to account for individual circumstances. "Decisions to deviate from the starting points provided by the *Heiser* framework are committed to the discretion of the particular court in each case." *Oveissi v. Islamic Republic of Iran* ("*Oveissi II*"), 768 F. Supp. 2d 16, 26 (D.D.C. 2011). For a directly injured claimant, "[c]ourts generally 'begin[] with the baseline assumption that persons suffering substantial injuries in terrorist attacks are entitled to $5 million in compensatory damages.'" *Barry I*, 410 F. Supp. 3d at 180 (quoting *Wultz*, 864 F. Supp. 2d at 37–38). An upward adjustment to the $7 to $12 million range may be appropriate "in more severe instances of physical and psychological pain, such as where victims suffered relatively more numerous and severe injuries, were rendered quadriplegic, partially lost vision and hearing, or were mistaken for dead." *Valore*, 700 F. Supp. 2d at 84. Conversely, a downward departure to the $1.5 million to $3 million range may be appropriate "where victims suffered relatively more minor injuries, such as 'minor shrapnel injuries,' or 'severe emotional injury accompanied by relatively minor physical injuries.'" *Barry I*, 410 F. Supp. 3d at 180 (first quoting *Valore*, 700 F. Supp. 2d at 84, then quoting *Estate of Doe v. Islamic Republic of Iran* ("*Estate of Doe II*"), 943 F. Supp. 2d 180, 186 (D.D.C. 2013)). Awards for physical injuries "assume severe psychological injuries." *Schertzman Cohen*, 2019 WL 3037868, at *6 (citing *Wamai v. Republic of Sudan*, 60 F. Supp. 3d 84, 92–93 (D.D.C. 2014)).

For family member claimants, the relationship between the victim and the family member who seeks relief determines the baseline amount of the award. *See Peterson*, 515 F. Supp. 2d at 51. As a starting point, the family of a deceased victim typically receives damages in the amount

of $8 million for a spouse, $5 million for a child or parent, and $2.5 million for a sibling.  *See Schooley v. Islamic Republic of Iran*, No. 17-cv-1376, 2019 WL 2717888, at *74 (D.D.C. June 27, 2019) (citing *Valencia*, 774 F. Supp. 2d at 15).  These amounts are halved for the family of an injured victim, with courts generally awarding $4 million to a spouse, $2.5 million to a child or parent, and $1.25 million to a sibling.  *Id.*

An upward adjustment may be appropriate "in cases 'with aggravating circumstances,' indicated by such things as '[t]estimony which describes a general feeling of permanent loss or change caused by decedent's absence' or '[m]edical treatment for depression and related affective disorders.'"  *Valore*, 700 F. Supp. 2d at 85–86 (first quoting *Greenbaum*, 451 F. Supp. 2d at 108, then quoting *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 31 (D.D.C. 1998)).  Whether such an adjustment is in order is a fact-specific inquiry that "cannot be defined through models and variables."  *Fraenkel*, 892 F.3d at 356–57 (quoting *Flatow*, 999 F. Supp. at 30).  In parsing the relevant facts, a district court is to bear in mind that "past solatium awards from comparable cases are appropriate sources of guidance," but "different plaintiffs (even under FSIA) will prove different facts that may well (and should) result in different damage awards."  *Id.* at 362 (citation and internal quotations omitted); *see also Schooley*, 2019 WL 2717888, at *77 (citing *Fraenkel*, 892 F.3d at 362).

## 2.  Compensatory Damages Awards

In summary, the base award for each Surviving Family Plaintiff is $8 million to a spouse, $5 million to a parent or child, and $2.5 million to a sibling.  The base award to each directly injured Navy Plaintiff is $5 million.  The base award for each Immediate Family Plaintiff is $4 million to a spouse, $2.5 million to a child or parent, and $1.25 million to a sibling.  These

awards are subject to the adjustments based on the Plaintiff-specific facts set forth below.[11]  In
general, and consistent with the framework outlined above, the Court has made downward
adjustments to Navy Plaintiffs' pain and suffering damage awards where no physical injury was
alleged, with the magnitude of that adjustment subject to specific factual allegations about the
disabling consequences of the emotional injuries.  Conversely, the Court has made upward
adjustments to Navy Plaintiffs' pain and suffering damage awards based on the number and
severity of the physical and emotional injuries suffered.  In all cases, the Court placed added
weight on disability ratings assigned by objective medical professionals at the Department of
Veterans Affairs (the "VA"), as indicated in Plaintiffs' submissions.  *See* 30 C.F.R. § 4.10
(explaining that "medical examiner[s]" base disability evaluations on "the ability of the body as a
whole, or of the psyche, of a system or organ of the body to function under the ordinary
conditions of daily life including employment" using "etiological, anatomical, pathological,
laboratory, and prognostic data required for ordinary medical classification"); *Schooley*, 2019
WL 2717888, at *74 ("The VA disability rating, which includes both mental and physical
injuries in a single number, facilitates an approach to awarding damages that is generally
agnostic to the mental or physical nature of the injury and further provides a relatively objective
measure of comparative injuries among [plaintiffs].").  With that said, before listing Plaintiffs'
injuries and awards below, the Court acknowledges that the cold assignment of a number value
to Plaintiffs' injuries cannot "perfectly reflect the measure of individual suffering."  *Barry I*, 410
F. Supp. 3d at 180.

---

[11] Deceased Sailors and Navy Plaintiffs are listed in the umbrella paragraphs, while
family members are listed in the indented paragraphs underneath the Sailors to whom they are
related.

1.  <u>Late Signalman Seaman Cherone Louis Gunn</u>:  Cherone Louis Gunn, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.1; Ex. C to Pls.' Mot. at 12–13, ECF No. 31-3.[12]

    i.  <u>Mona Gunn</u>:  The mother of Cherone Louis Gunn, Plaintiff Mona Gunn, learned of her son's death at the U.S. naval base in Norfolk, Virginia on the day of the attack.  *Id.* at 6–7.  She experiences "music-related triggers" that lead to "feeling[s] of sadness and missing [her] son." *Id.* at 7.  Holidays are particularly difficult time for her, especially Christmas, given that "it is a time when family members away come home for the holidays" and the family has "a son and brother that was never coming home again." *Id.* at 8.  She has "also experienced sadness, anger, and frustration throughout the years following Cherone's death because no one was held accountable for the" attack.  *Id.*  In light of these facts, the Court finds that Plaintiff Mona Gunn is entitled to the base award of $5 million in solatium damages.

    ii. <u>Anton Gunn</u>:  The brother of Cherone Louis Gunn, Plaintiff Anton Gunn, states that he has "moments of uncontrollable crying in movie theaters and while sitting home" when remembering his brother and his service.  *Id.* at 19.  He will "start to cry and at times have anxiety" when "watch[ing] military stories on the news and even military tributes at sporting events." *Id.*  In light of these facts, the Court finds that Plaintiff Anton Gunn is entitled to the base award of $2.5 million in solatium damages.

    iii. <u>Jamal Gunn</u>:  The brother of Cherone Louis Gunn, Plaintiff Jamal Gunn, experienced a "level of grief" that was "unimaginable" after being told that his brother was killed.  *Id.* at 27.  He was not "prepare[d] for how exhausting it is to go through that much grief," and observing his mother "grief-stricken and distraught essentially doubled the grief that [he] was feeling." *Id.*  He states that with his brother's death, the "family was never the same again." *Id.* at 28. In light of these facts, the Court finds that Plaintiff Jamal Gunn is entitled to the base award of $2.5 million in solatium damages.

    iv. <u>Jason Gunn</u>:  The brother of Cherone Louis Gunn, Plaintiff Jason Gunn, explains that his brother "truly became [his] best friend" later in life, and that he was the one who dropped him off at the dock on the morning he left on deployment.  *Id.* at 34.  He learned of his brother's death at the U.S. naval base alongside his mother.  *Id.* at 35.  "Between feelings of sadness, frustration and anger," he states, "time has only helped with the frustration." *Id.* at 36.  In light of these facts, the Court finds that Plaintiff Jason Gunn is entitled to the base award of $2.5 million in solatium damages.

---

[12] For consistency, the Court cites to page numbers automatically generated through the electronic filing system when it refers to Plaintiffs' affidavits and supporting materials.

2. <u>Late Seaman Lakiba Nicole Palmer</u>:  Lakiba Nicole Palmer, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.5; Ex. D to Pls.' Mot. at 32–33, ECF No. 31-4.

    i. <u>Avinesh Kumar</u>:  The spouse of Lakiba Nicole Palmer, Plaintiff Avinesh Kumar, states that the two were "happily married" and recently had a baby girl.  Ex. D to Pls.' Mot. at 4.  After losing his wife, he "suffered from major depression" requiring "treatment and even medication." *Id.* at 5.  He explains that "it has been incredibly hard raising our daughter as a single parent without her mother to be there for her." *Id.*  In light of these facts, the Court finds that Plaintiff Avinesh Kumar is entitled to the base award of $8 million in solatium damages.

    ii. <u>Preshilla Caprice Kumar</u>:  The daughter of Lakiba Nicole Palmer, Plaintiff Preshilla Caprice Kumar, states that she was 18 months old at the time of the attack on the Cole.  *Id.* at 9.  She explains that she never had the chance to know her mother and wishes she had "been able to have a relationship with her." *Id.* at 10.  "[G]rowing up without a mother was especially hard," and "[t]here are times that [she will] break down wishing [her] mother was here with [her] today." *Id.* at 10.  In light of these facts, the Court finds that Plaintiff Preshilla Caprice Kumar is entitled to the base award of $5 million in solatium damages.

    iii. <u>Theresa Embry</u>:  The mother of Lakiba Nicole Palmer, Plaintiff Theresa Embry, states that "Lakiba's Birthday and Christmas are always very difficult [to] get through because all of those feelings about her loss come rushing back." *Id.* at 16.  She does not "celebrate any holidays anymore." *Id.*  After the attack, she experienced "sadness, anger, depression, and anxiety." *Id.*  In October 2001, one year after the attack, Theresa Embry's brother committed suicide, leaving a note "stating that he couldn't handle Lakiba being by herself in heaven and so he was going to be with Lakiba." *Id.*  At times, "tears just start rolling down [her] cheeks for no apparent reason" and she "couldn't function mentally due to the impact of the loss of [her] daughter." *Id.* at 16–17. She required medication to treat her depression. *Id.* at 17.  In light of these facts, the Court finds that Plaintiff Theresa Embry is entitled to the base award of $5 million in solatium damages.

    iv. <u>Hugh Palmer</u>:  The father of Lakiba Nicole Palmer, Plaintiff Hugh Palmer, states that she "was, and still is, the joy of [his] life" and "the reason [he] would wake up in the morning." *Id.* at 21.  He explains that living without her "has been difficult each and every day," and that he has "been very depressed over the years." *Id.* at 22.  He experiences sadness that is "debilitating" and states that there is "no relief in [his] suffering." *Id.*  He has been unable to "process the pain and move on," as he "carr[ies] the pain and agony with [him]." *Id.*  In light of these facts, the Court finds that Plaintiff Hugh Palmer is entitled to the base award of $5 million in solatium damages.

v.  <u>Ollesha Smith</u>:  The sister of Lakiba Nicole Palmer, Plaintiff Ollesha Smith, states that she was 12 years old at the time of the attack on the Cole.  *Id.* at 25. She feels that the family is no longer "as close as [it] used to be" and that "[t]he loss of Lakiba splintered" them.  *Id.*  "For years," the family "did not celebrate holidays or any days" because "there was nothing to celebrate."  *Id.* at 26.  She suffers from "PTSD when it comes to loud noises, and the sound of planes makes [her] world stop."  *Id.* at 25.  In light of these facts, the Court finds that Plaintiff Ollesha Smith is entitled to the base award of $2.5 million in solatium damages.

vi.  <u>Jack Swenson</u>:  The brother of Lakiba Nicole Palmer, Plaintiff Jack Swenson, states that when he learned his sister had been killed, he "started crying uncontrollably," "felt numb," and "felt like life had ended for [him] as well." *Id.* at 30.  He had previously lived with her in Norfolk, and she "played … a positive role in [his] life."  *Id.*  He expresses sadness that his "children will never get to experience the caring[,] loving person [he] did."  *Id.* at 31.  In light of these facts, the Court finds that Plaintiff Jack Swenson is entitled to the base award of $2.5 million in solatium damages.

3.  <u>Late Information Systems Technician James Rodrick McDaniels</u>:  James Rodrick McDaniels, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.11; Ex. E to Pls.' Mot. at 9, ECF No. 31-5.[13]

i.  <u>Dianne McDaniels</u>:[14]  The mother of James Rodrick McDaniels, Plaintiff Dianne McDaniels states that she was at home when Navy officials notified her of her son's death. Ex. E to Pls.' Mot. at 4.  She was "devastated and in pure shock" and "was depressed for a long time after [she] received that horrible news."  *Id.*  She experiences "wave[s] of sadness" and "get[s] choked up when [she] talk[s] about what happened to him."  *Id.* at 5.  "For the first three years after the bombing, the Navy continued to send [the family] more of his remains and so in total [they] had three funerals for" him.  *Id.* at 5.  In light of these facts, the Court finds that Plaintiff Dianne McDaniels is entitled to the base award of $5 million in solatium damages.

ii.  <u>Dominique McDaniels</u>:  The sister of James Rodrick McDaniels, Plaintiff Dominique McDaniels, states that she and her brother were "close" and that she "looked up to him."  *Id.* at 11.  When she learned of his death, her "whole world crumbled," and she missed "school for over a month because all [she] did was cry every day."  *Id.*  She experiences sadness during holidays and "[h]is loss still brings [her] to tears."  *Id.* at 12.  His death "left a hole in [her] family that can never be filled because he can never be replaced."  *Id.*  In light

---

[13] Plaintiff Daisaan McDaniels voluntarily dismissed claims against Iran in this action without prejudice.  *See* ECF No. 19.

[14] Plaintiff's legal name is now Dianne Harris.  Ex. E to Pls.' Mot. at 3.

of these facts, the Court finds that Plaintiff Dominique McDaniels is entitled to the base award of $2.5 million in solatium damages.

iii. <u>Frederica Phoenix</u>:  The sister of James Rodrick McDaniels, Plaintiff Frederica Phoenix, states that she "was his protective big sister" and that she "miss[es] him every day."  *Id.* at 15.  She is "still tremendously impacted by [her] brother's death."  *Id.* at 16.  "Because of the attack, [she] cannot go on a boat/ship" and she has "stomach issues and terrible panic attacks because of his tragic death, especially around the anniversary."  *Id.*  In addition, she is "fearful of enclosed spaces because [she is] scared something will happen to [her] like it did to [her] brother."  *Id.*  In light of these facts, the Court finds that Plaintiff Frederica Phoenix is entitled to the base award of $2.5 million in solatium damages.

4. <u>Late Electronics Warfare Technician 1st Class Kevin Shawn Rux</u>:  Kevin Shawn Rux, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.15; Ex. F to Pls.' Mot. at 10, 12, ECF No. 31-6.

i. <u>Olivia Rux</u>:  The wife of Kevin Shawn Rux, Plaintiff Olivia Rux, states that "[t]he anger from [his] death consumed [her] and has led [her] down a destructive path."  Ex. F to Pls.' Mot. at 7.  She "became withdrawn," and "depression and anxiety took over [her] life."  *Id.*  She feels "trapped in a world of pain that never goes away," and "[t]he guilt of having to continue on living and try to be happy leaves [her] empty."  *Id.*  She explains that her "relationships have failed because it is too difficult for significant others to endure the grief and suffering [she] experience[es] from [his] death."  *Id.*  For "years," she would "sleep[] on a couch or in a recliner" "as going to bed meant sleeping alone."  *Id.*  She additionally experienced "nightmares about the explosion" and "could hear sailors scream and see water rushing in."  *Id.*  In light of these facts, the Court finds that Plaintiff Olivia Rux is entitled to the base award of $8 million in solatium damages.

5. <u>Late Information Systems Technician Seaman Timothy Lee Gauna</u>:  Timothy Lee Gauna, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.16; Ex. G to Pls.' Mot. at 7–8, ECF No. 31-7.

i. <u>Sarah Esquivel</u>:  The mother of Timothy Lee Gauna, Plaintiff Sarah Esquivel, states that he was her "pride and joy."  Ex. G to Pls.' Mot. at 4.  She "still cr[ies] when thinking about [him], get[s] anxiety attacks, and ha[s] moments when [she] just want[s] to lie down and not get up."  *Id.* at 5.  She explains that his "death hurts everyday and it hurts just as much as the day it happened."  *Id.*  Because October 12 is her wedding anniversary, the date "has been replaced by grieving the anniversary of [her] oldest child's death."  *Id.*  She "feel[s] so guilty for being alive and getting old" and asks, "Why him and not me?"  *Id.*  In light of these facts, the Court finds that Plaintiff Sarah Esquivel is entitled to the base award of $5 million in solatium damages.

6. <u>Late Engineman 2nd Class (Surface Warfare Specialist) Marc Nieto</u>:  Marc Nieto, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.17; Ex. H to Pls.' Mot. at 11, 23–24, ECF No. 31-8.

    i. <u>Sharon Priepke</u>:  The mother of Marc Nieto, Plaintiff Sharon Priepke, states that she learned he was missing in action when a Navy officer "came knocking on the door," and later learned of his death through a phone call from his fiancée.  Ex. H to Pls.' Mot. at 5.  She explains that "[w]eddings and funerals and family gatherings are very overwhelming," and that [w]hen troops make it home from service [she] really lose[s] it because [he] was supposed to be home in two week[s]" after the attack occurred.  *Id.* at 6.  She states that "[t]here's always an empty chair on holidays."  *Id.*  In light of these facts, the Court finds that Plaintiff Sharon Priepke is entitled to the base award of $5 million in solatium damages.

    ii. <u>Connie Albright</u>:  The sister of Marc Nieto, Plaintiff Connie Albright, states that he "was always there for [her]" during a turbulent childhood and "throughout [their] lives."  *Id.* at 14.  She explains that her "mother and [her] have never had the same relationship since his death" and that her "marriage suffered and ended in divorce" following the funeral.  *Id.* at 15.  "The meds [she] was on made [her] less able to feel compassion and life as [she] knew it was over."  *Id.*  She "was robbed of being able to depend on [her] brother to help [her] move, celebrate life moments," and have a "shoulder to cry on."  *Id.*  She has "been in therapy ever since his death as well" and has undergone "treat[ment] for PTSD."  *Id.*  In light of these facts, the Court finds that Plaintiff Connie Albright is entitled to the base award of $2.5 million in solatium damages.

    iii. <u>Jeffrey McKee</u>:  The brother of Marc Nieto, Plaintiff Jeffrey McKee, states that they were "inseparable during childhood" and says that Marc was his "best friend."  *Id.* at 19.  He explains that the family learned of Marc's death at a memorial ceremony, and that he was "pinned between two bulkheads where he had drown[ed] after the explosion."  *Id.* at 20.  Plaintiff Jeffrey McKee was "devastated" and "felt like pieces of [him] were gone and the darkness took over."  *Id.*  He and his brother celebrated birthdays together, "and now [he is] forced to celebrate it alone."  *Id.*  "For 17 years after [his] brother's death [he] tried to mask [his] feelings with alcohol" and "was diagnosed with a heart condition" as a result.  *Id.* at 21.  In light of these facts, the Court finds that Plaintiff Jeffrey McKee is entitled to the base award of $2.5 million in solatium damages.[15]

---

[15] Affidavits indicate that Plaintiff Jeffrey McKee may be a half-sibling or stepsibling of Marc Nieto.  *See* Ex. H to Pls.' Mot. at 14.  To the extent such a finding is required, the Court concludes based on the contents of the affidavits that he is the "functional equivalent[] of [an] immediate family member[]" to Marc Nieto.  *Bettis*, 315 F.3d at 337; *see also* Ex. H to Pls.' Mot. at 18–22.

7. <u>Late Ensign Andrew Triplett</u>:  Andrew Triplett, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.20; Ex. I to Pls.' Mot. at 24–25, ECF No. 31-9.

   i. <u>Lorrie Triplett</u>:  The wife of Andrew Triplett, Plaintiff Lorrie Triplett, states that when the attack occurred, she felt "nervous and confused" and that "[h]is death has made it difficult mentally and physically for [her]."  Ex. I to Pls.' Mot. at 4.  Her "health has declined and [her] mental health is bad."  *Id.*  She "[has] nightmares about the bombing all the time, even now, 23 years later."  *Id.*  She "cannot remember a time when [she didn't] ha[ve] nightmares."  *Id.*  Her "daughters will never be the same, which further impacts [her] as their mother."  *Id.*  "Both of [her] daughters have not married or had kids because of the death of their dad – losing him really affected their ability to be in relationships."  *Id.*  "[Her] family was forever changed with" the attack.  She "miss[es] [her] husband dearly," and "[e]very day at 10:12 am and 10:12 pm [her] heart stops."  *Id.*  In light of these facts, the Court finds that Plaintiff Lorrie Triplett is entitled to the base award of $8 million in solatium damages.

   ii. <u>Andrea Triplett</u>:  The daughter of Andrew Triplett, Plaintiff Andrea Triplett, states that she used to "go fishing with [her] father" and "continued to [fish] as [she] grew up" because it "gave [her] a sense of him being with [her]."  *Id.* at 10.  She "missed out on having [her] father for most of [her] life."  *Id.*  She "would dream and imagine daily that [her] father was [t]here with her while growing up doing the things that [her] friends' dads would do."  *Id.*  She "[did] not get to have father and daughter dances or talk to him and learn who he is."  *Id.*  "He would not be [t]here for other milestones in [her] life," either.  *Id.*  "His loss left a hole in [her] heart that can never be filled."  *Id.*  She has remained in "therapy for the past 23 years" since her father's passing.  *Id.*  In light of these facts, the Court finds that Plaintiff Andrea Triplett is entitled to the base award of $5 million in solatium damages.

   iii. <u>Savannah Triplett</u>:  The daughter of Andrew Triplett, Plaintiff Savannah Triplett, states that she "miss[es] her father, beyond words," and that "[t]he greatest part of his loss was the fact that [she does not] have any memories of him."  *Id.* at 14.  "Throughout [her] life, there have been many milestones where [she] wish[es] [her] dad was in the crowd cheering [her] on."  *Id.*  "[Her] mental health has suffered greatly because of" the attack, and that she "would have nightmares" when she "was younger."  *Id.*  She has "been in therapy most of [her] adult life" and has experienced "moments of psychosis" during which she "thought [her] dad had come back home and was with [her] again."  *Id.*  She explains that her family members "are all suffering every single day of [their] lives."  *Id.*  In light of these facts, the Court finds that Plaintiff Savannah Triplett is entitled to the base award of $5 million in solatium damages.

   iv. <u>Freddie Triplett</u>:  The brother of Andrew Triplett, Plaintiff Freddie Triplett, states that the two "had a close relationship growing up" and that he "was

always an excellent brother." *Id.* at 18.  He was "at home when Navy Officials came to give [the] family Andrew's status." *Id.*  He has "been unable to articulate the grief [he] feel[s] from losing [his] brother," and he "suffer[s] a great deal from anxiety and bouts of sadness" and "had a hard time sleeping throughout the night because of the circumstances of his death." *Id.*  He "was very angry after Andrew was killed" and "went to a doctor and was prescribed blood pressure medication and other drugs to help cope with [his] feelings of anxiety, depression, and anger." *Id.*  In light of these facts, the Court finds that Plaintiff Freddie Triplett is entitled to the base award of $2.5 million in solatium damages.

    v.  <u>Kevin Triplett</u>:  The brother of Andrew Triplett, Plaintiff Kevin Triplett, states that his "relationship with Andrew was wonderful" and that they "had a very special bond." *Id.* at 21.  He was "devastated" when he learned of his brother's death, and he explains that his brother "was so decomposed that [the Navy] would not allow [the family] to see him." *Id.*  "Every October is very sad for [him]." *Id.*  He "miss[es] Andrew very much" and "many days [he] would have to pull over [his truck] to quietly cry when [he] thought of Andrew." *Id.* at 22.  In light of these facts, the Court finds that Plaintiff Kevin Triplett is entitled to the base award of $2.5 million in solatium damages.

8.  <u>Late Electronics Technician Chief Petty Officer Richard Costelow</u>:  Richard Costelow, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.25; Ex. J to Pls.' Mot. at 43–46, ECF No. 31-10.

    i.  <u>Sharla Costelow</u>:  The wife of Richard Costelow, Plaintiff Sharla Costelow, states that they "had been married for 10 years before he was murdered" and that they "had a happy marriage and were raising a beautiful family together." Ex. J. to Pls.' Mot. at 4.  She learned of his death "when the men in uniform showed up and confirmed that Richard had died." *Id.*  She "went into shock," after which "grief and depression set in." *Id.*  She explains that she "was depressed and distraught but had to try to be everything to [their] three boys." *Id.* at 5.  His "death turned [their] family's world upside down." *Id.* "Financially, [she] had to sell [her] house and move back to East Texas with [her] mother." *Id.*  She "ha[s] experienced depression over the years" and explains that "[t]he stress and depression [she] experience[s] because of Rich's death cause [her] to be in a continued state where [her] motor skills are compromised" due to Parkinson's Disease.  *Id.*  "Thinking about Rich and that time triggers the tremors." *Id.*  In light of these facts, the Court finds that Plaintiff Sharla Costelow is entitled to the base award of $8 million in solatium damages.

    ii.  <u>Michael Dillon Pritchard</u>:  The stepson of Richard Costelow, Plaintiff Michael Dillon Pritchard, states that Richard Costelow "became [his] stepfather when [he] was less than two years old," and that he "treated [Plaintiff] like his own son from the start." *Id.* at 9.  He explains that "Rich was a prime example of what a good dad should be, and [he] was happy to be his son." *Id.*  At the

funeral on October 20, he "was able to see Dad's body," and "remember[s] thinking that he didn't look like the man [he] knew" and "[t]hat he must have been horribly burnt in the attack." *Id.* at 10. "[He] felt deep sadness and frustration, and remember[s] trying to hold back tears and be strong." *Id.* "Every year when the Autumn weather starts setting in" and through "the entire month of October," he "start[s] to reminisce and think about [his] Dad." *Id.* "It will always be a reminder of how his death forever changed [his] life and the lives of my family." *Id.* In light of these facts, the Court finds that Plaintiff Michael Dillon Pritchard is the "functional equivalent[] of [an] immediate family member[]" to Richard Costelow, *Bettis*, 315 F.3d at 337, and that he is entitled to the base award of $5 million in solatium damages.

iii. <u>Brady Costelow</u>: The son of Richard Costelow, Plaintiff Brady Costelow, states that he was "4 years old" at the time of the attack, *id.* at 13, but that it remains "one of [his] most vivid early memories," *id.* at 14. He explains that his father "always went far away and he always came back" to be with them, *id*, but "[o]ne day, he didn't come back," *id.* at 15. His mother "told [him] dad wasn't coming back. He was dead." *Id.* "Growing up, [he] was always quite aware that [he] was missing out on being a 'normal kid.'" *Id.* "Past trauma has held [him] back, and [he] still struggle[s] to form relationships beyond a surface level to this day." *Id.* "Losing the only father figure who has ever been in [his] life at a young age has stunted [his] ability to know how to be there for [his daughter], though [he] tr[ies] every day to overcome that." *Id.* at 16. In light of these facts, the Court finds that Plaintiff Brady Costelow is entitled to the base award of $5 million in solatium damages.

iv. <u>Ethan Costelow</u>: The son of Richard Costelow, Plaintiff Ethan Costelow, states that he does not "[r]emember much about [his] dad" because he had "turned 4 years old the month before [his father] died." *Id.* at 20. "[A]ll [he] ha[s] are home videos and photos." *Id.* "Growing up without [his] dad was difficult," as "[he] didn't have [his] father around to teach [him] things like how to play sports or how to play the guitar or to ride a bike." *Id.* He "was never able to participate in" "special events that required participation of a dad." *Id.* He "missed out on so much time with" his father, and "[t]he fact that it was a terrorist attack that took him away from [him] made it even worse." *Id.* He "ha[s] been going to therapy throughout [his] whole life and continue[s] to struggle with anxiety and depression." *Id.* In light of these facts, the Court finds that Plaintiff Ethan Costelow is entitled to the base award of $5 million in solatium damages.

v. <u>Dorothy Costelow</u>: The mother of Richard Costelow, Plaintiff Dorothy Costelow, states that she learned of her son's death when "military personnel arrived at [their] door and informed [them] of [his] death." *Id.* at 25. At the funeral, she "remember[s] him laying there and thinking that he just did not look the same at all. There was some kind of oil or debris on him that was clearly visible. It was like they could not get the debris off of him." *Id.* She "still ha[s] trouble sleeping," and "[i]t has been like this for 23 years,"

although it "was far worse in the years that followed the terrorist attack." *Id.*
She is "hurt and angered each time [she is] reminded" of the attack. *Id.* In
light of these facts, the Court finds that Plaintiff Dorothy Costelow is entitled
to the base award of $5 million in solatium damages.

vi.  Joseph R. Costelow:  The brother of Richard Costelow, Plaintiff Joseph R.
Costelow, states that he and his brother "had a close relationship as older and
younger brothers." *Id.* at 28.  He is "reminded of Rich's death often,
particularly on the anniversary of the bombing on October 12." *Id.* at 29.
"Because Rich was [his] only brother, [he] continue[s] to feel a special loss
due to his death." *Id.*  He is "saddened to think of all the years [they] could
have had together had he not been killed at such an early age." *Id.*  In light of
these facts, the Court finds that Plaintiff Joseph R. Costelow is entitled to the
base award of $2.5 million in solatium damages.

vii. Marion DiMauro:  The sister of Richard Costelow, Plaintiff Marion DiMauro,
states that she "always felt closest to Richie," that he "was [her] baby
brother," and that she "loved him so very much." *Id.* at 31.  She "helped [her]
Mom with Richie when he was a baby." *Id.*  She "was on [her] way to [her]
parents' home when [her] Dad called and told [her] that Richie was killed."
*Id.* at 32.  She "could not eat or think straight for days." *Id.*  She
"remember[s] how hard the funeral and burial were." *Id.*  "His death left a
terrible void in all his family's lives." *Id.* at 33.  In light of these facts, the
Court finds that Plaintiff Marion DiMauro is entitled to the base award of $2.5
million in solatium damages.

viii.   Carol Lynn DiMauro:  The sister of Richard Costelow, Plaintiff Carol
Lynn DiMauro, states that they "had a very close relationship" and "remained
close into young adulthood." *Id.* at 35.  She "was standing in [her] kitchen"
when she learned of his death and felt "disbelief" followed by "overwhelming
sadness and grief." *Id.*  Her "little brother's funeral was incredibly difficult
for [her] and [her] family." *Id.*  She "miss[es] Rich every day of [her] life."
*Id.* at 36.  "It makes [her] sad how many life events Rich has missed that [she]
would have enjoyed sharing with him." *Id.*  In light of these facts, the Court
finds that Plaintiff Carol Lynn DiMauro is entitled to the base award of $2.5
million in solatium damages.

ix.  Patricia Ryan:  The sister of Richard Costelow, Plaintiff Patricia Ryan, states
that "[e]veryone in [their] family was close with one another" and that the
"relationship remained close throughout their adulthood." *Id.* at 39.  She "was
at home with [her] son and husband when [she] finally received the news of
Richie's death." *Id.*  "[She] was devastated upon finally learning about [her]
brother's killing" and "felt a combination of disbelief and overwhelming
sadness." *Id.*  "Anger did not come until later, when [she] learned the
circumstances and that it was a terrorist attack." *Id.*  She "miss[es] [her]
brother all the time." *Id.* at 40.  In light of these facts, the Court finds that

Plaintiff Patricia Ryan is entitled to the base award of $2.5 million in solatium damages.

9. <u>Late Engineman Fireman Joshua Langdon Parlett</u>:  Joshua Langdon Parlett, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.34; Ex. K to Supp. Mot. ("First Supplement") at 43, ECF No. 32-1.

    i. <u>Etta Parlett</u>:  The mother of Joshua Langdon Parlett, Plaintiff Etta Parlett, states that "[t]here are hundreds of things that remind [her] of him" and that she "miss[es] everything about him."  Ex. K to First Supplement at 6.  "His death left a hole in [her] heart that nothing can fill."  *Id.*  "[Her] husband (Leroy) was never the same after Joshua's death."  *Id.*  "Now, [she] overly worr[ies] about [her] other children" and is "so afraid that something will happen to them."  *Id.*  In light of these facts, the Court finds that Plaintiff Etta Parlett is entitled to the base award of $5 million in solatium damages.

    ii. <u>LeRoy Parlett Estate</u>:  LeRoy Parlett's estate has substituted into this action.  *See supra* Section IV.C.2.b.  In lieu of an affidavit, the estate submits deposition testimony from another civil action.  In that testimony, LeRoy Parlett, the father of Joshua Langdon Parlett, described learning of the attack "on the radio in [his] truck" but not discovering his son's death until "close to midnight" when "the people from the Navy showed up."  *Id.* at 17.  He took "medication for depression," *id.* at 19, would "break down and cry for no reason," and was "angry" and "irritable."  *Id.* at 21.  In addition, he came to "avoid" activities he used to do with his son.  *Id.*  In light of these facts, the Court finds that Plaintiff LeRoy Parlett's Estate is entitled to the base award of $5 million in solatium damages.

    iii. <u>Matthew Parlett</u>:  The brother of Joshua Langdon Parlett, Plaintiff Matthew Parlett, states that he and his brother "had a lot of fun together" and "became closer as he grew up and truly enjoyed spending time together."  *Id.* at 31.  He learned about the attack while "at work in the lunchroom" and "[i]t still makes [him] cry when [he] talk[s] about Joshua."  *Id.*  He explains that Joshua "was [his] brother and best friend."  *Id.*  In light of these facts, the Court finds that Plaintiff Matthew Parlett is entitled to the base award of $2.5 million in solatium damages.

    iv. <u>Hannah Leslie Latham Parlett</u>:  The sister of Joshua Langdon Parlett, Plaintiff Hannah Leslie Latham Parlett, states that she and her brother were "very close" and that "[e]ven during his deployment, he would write letters as often as he could."  *Id.* at 35.  After the attack, she "spent many days in the following weeks/months sitting on a hill that was up the street from [their] house where [they] would often ride [their] bikes."  She "miss[es] him beyond words and beyond life."  *Id.* at 36.  In light of these facts, the Court finds that Plaintiff Hannah Leslie Latham Parlett is entitled to the base award of $2.5 million in solatium damages.

v. <u>Kera Parlett Miller</u>:  The sister of Joshua Langdon Parlett, Plaintiff Kera Parlett Miller, states that she and her brother "had a very close relationship" and the two "became best buddies" and "would hang out all the time together and do everything together." *Id.* at 39.  She describes her brother as "a great person" who was "always happy" and "was so giving and would literally give you the shirt off his back." *Id.*  His death was "very hard and very sad," and she explains that her "twin girls" will "never know how wonderful of an uncle he would have been." *Id.* at 41.  Their "family has never been the same since" the attack. *Id.*  In light of these facts, the Court finds that Plaintiff Kera Parlett Miller is entitled to the base award of $2.5 million in solatium damages.

10. <u>Late Mess Management Specialist Seaman Lakeina Francis</u>:  Lakeina Francis, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.39; Ex. L to First Supplement at 22, ECF No. 32-2.

i. <u>Sandra Francis</u>:  The mother of Lakeina Francis, Plaintiff Sandra Francis, states that her daughter "was [her] firstborn and the joy of [their] family's life." Ex. L. to First Supplement at 4.  She describes her daughter as "the glue that held the family together." *Id.*  On the day of the attack, the Navy informed her that her daughter was "presumed missing" and she "went into a state of complete shock." *Id.*  She learned the next day that her daughter was killed and felt "heartbroken and devastated by the terrible news." *Id.* at 5.  The family "had three separate funeral services for Lakeina, because as the ship was further examined and repaired, the Navy found additional body parts of hers, which were returned to [them] for burial." *Id.*  She explains that the "family will continue to miss her and grieve [their] loss" but "will never be the same." *Id.*  In light of these facts, the Court finds that Plaintiff Sandra Francis is entitled to the base award of $5 million in solatium damages.

ii. <u>Ronald Francis</u>:  The father of Lakeina Francis, Plaintiff Ronald Francis, states that he had "a very special relationship" with his daughter and that he "treated her like a princess" while "she cherished [him] as her father." *Id.* at 10.  He explains that "[n]othing could prepare [him] for the constant distress, anxiety and pain this tragedy brought to [him] and [his] family's lives." *Id.*  "After the official notice of her death, [they] were devastated." *Id.* at 11.  "Because her body parts were discovered at different times, [they] had two Funerals a year apart and a burial at sea for Lakeina." *Id.*  "On Memorial Day and June 7, her birthday, [he] still cr[ies] at her gravesite." *Id.*  In light of these facts, the Court finds that Plaintiff Ronald Francis is entitled to the base award of $5 million in solatium damages.

iii. <u>David Francis</u>:  The brother of Lakeina Francis, Plaintiff David Francis, states that he was "very close" with his sister and that he "loved her very much." *Id.* at 14.  On the day of the attack, "Lakeina called [him] to wish [him] a good [football] game," but "[b]efore [they] could say goodbye, the call was disconnected." *Id.*  He explains that "[i]t was crushing to accept that she was no longer with [them]" and that he "had to go to counseling." *Id.*  He "was

very depressed," "stopped playing sports," and "cried all the time." *Id.* Her death "impacted [his] grades, social life and just being a young man enjoying life," as "[i]t is not easy going through life without her." *Id.* In addition, he has experienced "suicidal thoughts" and "use[d] alcohol and engage[d] in dangerous activities and reckless behavior" as a result of her death. *Id.* at 15. In light of these facts, the Court finds that Plaintiff David Francis is entitled to the base award of $2.5 million in solatium damages.

iv. <u>James Francis</u>:  The brother of Lakeina Francis, Plaintiff James Francis, states that "[b]ecause the family would move about every 2 to 3 years, [they] were each other's best friends." *Id.* at 20.  They "went to elementary, middle, and high school together," and "Lakeina was [his] motivation," as "she kept [him] motivated and eager to strive for better for [himself]." *Id.* After the attack, his "world had crashed," and he "was angry and sad," as well as "lost" and "inconsolable." *Id.* at 21.  When the Navy "confirmed she was gone," "[t]he pain was excruciating." *Id.* He explains that "the loss of Lakeina was the most horrific point in [his] forty years of life on this earth." He "went through alcohol addiction, deep depression, and sleep deprivation." *Id.* In light of these facts, the Court finds that Plaintiff James Francis is entitled to the base award of $2.5 million in solatium damages.

11. <u>Late Fireman Apprentice Patrick Roy</u>:  Patrick Roy, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.43; Ex. M to First Supplement at 16–19, ECF No. 32-3.

i. <u>Kathy Ann Brown</u>:  The mother of Patrick Roy, Plaintiff Kathy Ann Brown, states that she raised her son as "a stay-at-home, hands-on mom" and that "[i]t was a pleasure for [her] to watch him grow into a generous, kind, capable young man." *Id.* at 4.  The Navy initially informed her that her son "had not been found yet," but "divers recovered the body of [her] son" on the day of the "memorial service" in Norfolk. *Id.* at 5.  She struggles with "the day-to-day realization that Patrick is dead." *Id.* at 6.  In light of these facts, the Court finds that Plaintiff Kathy Ann Brown is entitled to the base award of $5 million in solatium damages.

ii. <u>Kevin Roy</u>:  The brother of Patrick Roy, Plaintiff Kevin Roy, states that his brother's "death completely changed the trajectory of [his] life." *Id.* at 9. After the attack, he "was stagnant and unmotivated" and "decided not to go to college" while he was "trying to find a way to deal with the grief." *Id.* "The Attack and the drinking ha[ve] caused [him] to withdraw a bit from [his] family and also put an emotional strain on [his] relationship with [his] mother." *Id.* "There's not a day that goes by that [he] do[es] not think of [his] brother], and what he would be like today." *Id.* In light of these facts, the Court finds that Plaintiff Kevin Roy is entitled to the base award of $2.5 million in solatium damages.

iii. <u>Sean Walsh</u>:  The brother of Patrick Roy, Plaintiff Sean Walsh, states that he and his brother "were very close" and that "[w]hen Patrick was in the Navy, [they] often communicated through email." *Id.* at 13.  After the attack, he felt "devastated and angry," *id.* at 14, and he explains that "[w]hen Patrick was killed, it destroyed [his] life," *id.* at 15.  "After the grief, came a deep depression which made it impossible to deal with life or perform at [his] job." *Id.*  "By the time [he] realized that [he] needed some kind of counseling or medical help, [he] had lost [his] job and access to health care." *Id.*  "[He] was prone to explosive outbursts and periods of hopelessness so severe that [he] would stay in bed for days at a time, often in tears." *Id.*  He states that he has "a functional life, but it is a life without the possibility of true joy." *Id.*  In light of these facts, the Court finds that Plaintiff Sean Walsh is entitled to the base award of $2.5 million in solatium damages.

12. <u>Late Fireman Gary Swenchonis Jr.</u>:  Gary Swenchonis Jr., a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.46; Ex. N to First Supplement at 16, ECF No. 32-4.

i. <u>Deborah Swenchonis</u>:  The mother of Gary Swenchonis Jr., Plaintiff Deborah Swenchonis, states that Navy officials initially informed her that her son was missing, but she later "got the news that [her] son's body had been found." Ex. N to First Supplement at 4.  She first experienced "fear and uncertainty because [she] didn't know whether Gary was alive or not." *Id.* at 5.  "Then [her] heart was hurt and [their] family was crushed when [they] finally got the news." *Id.*  She does not "think [the family] will ever recover from this tragedy." *Id.*  She "still think[s] about losing him constantly" and compares his death to "los[ing] your ability to see, live, feel and be alive." *Id.*  In light of these facts, the Court finds that Plaintiff Deborah Swenchonis is entitled to the base award of $5 million in solatium damages.

ii. <u>Gary Swenchonis Sr.</u>:  The father of Gary Swenchonis Jr., Plaintiff Gary Swenchonis Sr., states that since the attack, he has "experienced both anxiety and depression." *Id.* at 9.  "[His] heart was hurting and [their] family was crushed when [they] eventually got the news that Gary was killed." *Id.*  He "still struggle[s]" and "do[es] not believe [his] family will ever recover from this tragedy." *Id.*  They "are missing a very important part of [their] lives, [their] family member, [his] son is gone." *Id.*  "It is unbearable at times," he explains.  *Id.*  In light of these facts, the Court finds that Plaintiff Gary Swenchonis Sr. is entitled to the base award of $5 million in solatium damages.

iii. <u>Shalala Swenchonis-Wood</u>:  The sister of Gary Swenchonis, Jr. Plaintiff Shalala Swenchonis-Wood, states that "los[ing] [her] only sibling because of a violent, publicized, terrorist attack intensifies the plethora of emotions [she] feel[s] daily." *Id.* at 13.  "There are now a variety of triggers that elicit a sadness so profound only those experiencing it would understand it." *Id.* "There are days [she] cr[ies] as if it just happened and the feeling is so raw,

[she] get[s] nauseous." *Id.* The attack "not only impacted [her] life, but [her] children's," as her "youngest son" searched for information about it when "[h]e was only 10 years old" and "wound-up having nightmares of what he envisioned from images he searched and movies today." *Id.* She also "watch[es] [her] parents battle grief that is never ending and has overtaken the life they once lived." *Id.* at 14. "It is crazy," she explains, "how one act of violence can send a ripple so far across the world that it creates a tsunamis of destruction in innocent people's lives." *Id.* In light of these facts, the Court finds that Plaintiff Shalala Swenchonis-Wood is entitled to the base award of $2.5 million in solatium damages.

13. <u>Late Seaman Craig Wibberley</u>: Craig Wibberley, a United States Navy Sailor, was killed in the attack on the Cole. Compl. ¶ 3.49; Ex. O to First Supplement at 22–23, ECF No. 32-5.

   i. <u>Patricia Wibberley</u>: The mother of Craig Wibberley, Plaintiff Patricia Wibberley, states that she learned of her son's death on the day of the attack and that they "were devastated." Ex. O to First Supplement at 4. Following the attack, she "experienced a lot of anxiety and loss of concentration." *Id.* "Every morning when [she] woke up, Craig would be on [her] mind." *Id.* "And [she] relive[s] the day he died all over again." *Id.* "[She] hate[s] to imagine the pain Craig went through that day, and it tears [her] up inside." *Id.* She "developed PTSD that manifested in a number of ways after Craig's death," including at her work. *Id.* She "felt like [she] was in a terrible 'DAZE' for what seemed like years," and "[e]very night [she] still pray[s] that Craig will come smiling to [her] in a dream." *Id.* at 5. In light of these facts, the Court finds that Plaintiff Patricia Wibberley is entitled to the base award of $5 million in solatium damages.

   ii. <u>Thomas Wibberley</u>: The father of Craig Wibberley, Plaintiff Thomas Wibberley, states that he "had mental health counseling for a period after Craig's death" and that "[i]t was very hard on [him] to lose [his] son." *Id.* at 10. He "miss[es] the times [they] had together," including "working on his pickup truck," "rid[ing] in [his] Corvette," and "teaching Craig how to shoot rifles and pistols." *Id.* He explains that he "will never get to see Craig get married and have a family." *Id.* He is "involved with the court sessions going on in Guantanamo Bay" and has "made eleven trips to Cuba." *Id.* The family "visit[s] Craig's gravesite every year on his birthday," and "[e]very Christmas Eve, [he] goes] to Craig's grave at midnight by [him]self to visit him." *Id.* In light of these facts, the Court finds that Plaintiff Thomas Wibberley is entitled to the base award of $5 million in solatium damages.

   iii. <u>Toni Lewis</u>: The sister of Craig Wibberley, Plaintiff Toni Lewis, states that she and her brother "were the best of friends" until the attack, when "Craig's dreams, [her] dreams, [their] family's dreams of growing old together, watching [their] kids grow up together, and enjoying the rest of [their] lives together, were all shattered." *Id.* at 14. She explains that "[t]here is

absolutely no question that [she] miss[es] [her] little brother," that "[t]here isn't a day that goes by that [she does not] think of him," and that "19 years was surely not enough time with him." *Id.* at 17.  In light of these facts, the Court finds that Plaintiff Toni Lewis is entitled to the base award of $2.5 million in solatium damages.

14. <u>Late Hull Maintenance Technician Kenneth Clodfelter</u>:  Kenneth Clodfelter, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.52; Ex. P to First Supplement at 8, ECF No. 32-6.

    i. <u>Noah Clodfelter</u>:  The son of Kenneth Clodfelter, Plaintiff Noah Clodfelter, states that he "was 2 years old" at the time of the attack, Ex. P to First Supplement at 3, and that "it hurts [him] so deeply that [he] never got the chance to know [his] father and be around him," *id.* at 5.  He does not "think there are words to describe how much [he] miss[es] and ha[s] needed [his] father every day." *Id.*  He explains that he has "seen more life than [his] father] was able to experience, which makes [him] deeply sad." *Id.* at 6.  He has "anxiety and depression from the events that transpired after his [father's] death" and has "mentally been to some very dark places in [his] life." *Id.*  In addition, "[t]he idea of the Navy still recovering pieces of remains long after the funeral was very upsetting to [him]." *Id.*  In light of these facts, the Court finds that Plaintiff Noah Clodfelter is entitled to the base award of $5 million in solatium damages.

15. <u>Late Mess Management Specialist 3rd Class Ronchester Santiago</u>:  Ronchester Santiago, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.53; Ex. Q to First Supplement at 7, ECF No. 32-7.

    i. <u>Simeona Santiago</u>:  The mother of Ronchester Santiago, Plaintiff Simeona Santiago, states that Navy officials "came to [their] home and told [them] that [their] son, Ronchester, was missing," on the day of the attack.  Ex. Q to First Supplement at 4.  She did not "receive[] the news that Ronchester was dead" until "three days later." *Id.*  After the attack, her "health declined significantly, and she "developed high blood pressure, depression, and suffered from loss of appetite." *Id.*  She "also began to worry intensely about almost everything." *Id.*  She "continue[s] to experience long-term grief," and she explains that their "family remains devastated to this day." *Id.* at 5.  "Holidays and other occasions will never be the same because [their] son will never again be a part of those family events." *Id.*  In light of these facts, the Court finds that Plaintiff Simeona Santiago is entitled to the base award of $5 million in solatium damages.

16. <u>Late Electronics Warfare Technician 2nd Class Ronald Scott Owens</u>:  Ronald Scott Owens, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.54; Ex. R to First Supplement at 21, ECF No. 32-8.

i. <u>Jaime Owens Estate</u>:  Jaime Owens's estate has substituted into this action. *See supra* Section IV.C.2.a.  In lieu of an affidavit, the estate submits deposition testimony from another civil action.  In that testimony, Jaime Owens, the spouse of Ronald Scott Owens, stated that she had been married to him for five years at the time of the attack and that "[h]e was a great father [and] a wonderful husband."  Ex. R to First Supplement at 10.  On the day of the attack, Navy officials informed her that "there w[ere] three musters, and he hadn't showed up to any of them," and "at the time he was quoted missing in action."  *Id.* at 12.  She "found out about his death five days later."  *Id.*  She "didn't sleep," "didn't eat," and "had constant anxiety."  *Id.* at 13.  "For months, [she] still honestly believed that he was coming home."  *Id.*  She explained that her "whole life, from 15 on, was [her] husband, and then her child," and that she "had severe depression since Scott died."  *Id.*  In light of these facts, the Court finds that Plaintiff Jaime Owens's Estate is entitled to the base award of $8 million in solatium damages.

ii. <u>Isabella Owens Beasley</u>:  The daughter of Ronald Scott Owens, Plaintiff Isabella Owens Beasley, states that she "was 4 years old" at the time of the attack.  *Id.* at 4.  For "[a]bout 3 or four years," she "believed [her] dad was going to surprise [her] and show up, and that he "wasn't dead."  *Id.* at 4–5.  She "take[s] medication for anxiety" and "believe[s] that a large part of [her] anxiety stems from [her] father being killed when [she] was a child."  *Id.* at 5.  Growing up, "[she] was missing a father at all of [her] monumental moments (graduations, wedding, etc.)."  *Id.* at 6.  She explains that her "children will not meet any biological grandparents on [her] side of the family."  *Id.*  In light of these facts, the Court finds that Plaintiff Isabella Owens Beasley is entitled to the base award of $5 million in solatium damages.

17. <u>Late Operations Specialist 2nd Class Timothy Lamont Saunders</u>:  Timothy Lamont Saunders, a United States Navy Sailor, was killed in the attack on the Cole.  Compl. ¶ 3.56; Ex. S to First Supplement at 16–19, ECF No. 32-9.

i. <u>Jacqueline Saunders</u>:  The spouse of Timothy Lamont Saunders, Plaintiff Jacqueline Saunders, states that she is "haunted by th[e] day" of the attack and that the "moment . . . is still very present."  Ex. S to First Supplement at 4.  "Over the years since the attack, [she has] been battling depression with anxiety medications and was recently placed back on those medications because th[e] pain and sadness just won't seem to go away."  *Id.*  She experiences "anxiety attacks" where she "would feel as if [she] was suffering a heart attack."  *Id.* at 5.  "His death has been and is still such a constant hurt because of how [she is] coping with raising [their] two children during this process."  *Id.*  She explains that she and her husband "have missed out on so many things together," including "family events," "purchasing a new home together," and taking "family vacations."  *Id.*  In light of these facts, the Court finds that Plaintiff Jacqueline Saunders is entitled to the base award of $8 million in solatium damages.

    ii. <u>Isley Saunders</u>:  The daughter of Timothy Lamont Saunders, Plaintiff Isley Saunders, states that "[w]hen [her] Father died, [she] felt as though [her] soul and mind died along with him."  *Id.* at 9.  She "do[es] not just miss him, but often dwell[s] on the tragedy that took him from [them]."  *Id.*  "Because of this loss, [she] suffered through bouts of depression periodically between [her] childhood and adulthood."  *Id.*  "[Her] Father's loss caused [her] to shut down and withdraw from others at times, as well as a loss of the desire to fulfill many other life goals."  *Id.*  She is "currently in counseling that is focused largely on the loss of [her] Father."  *Id.*  She "would never wish the feeling of emptiness that comes with losing a father on anyone because it feels impossible to recover from."  *Id.*  In light of these facts, the Court finds that Plaintiff Isley Saunders, is entitled to the base award of $5 million in solatium damages.

    iii. <u>Jocelyn Saunders</u>:  The daughter of Timothy Lamont Saunders, Plaintiff Jocelyn Saunders, states that she "miss[es] [her] Dad so much that often it hurts to even speak of him as deceased."  *Id.* at 13.  "As [she has] grown, [she has] always wished he was [t]here to see [her] and give [her] advice, whether it's regarding dating, life, or just to have casual conversations."  *Id.*  "Losing [her] Dad affects a lot of [her] relationships," as well as "created a deep anxiety and fear of losing [her] Mom as she's [her] only parent left."  *Id.*  She "went through a point of depression and battled a lot of suicidal thoughts" as a result of his death.  In light of these facts, the Court finds that Plaintiff Jocelyn Saunders, is entitled to the base award of $5 million in solatium damages.

18. <u>Gas Turbine Systems Mechanic Fireman Recruit Matthew Saigger</u>:  Stationed aboard the Cole, Plaintiff Matthew Saigger was on duty near the overflow station at the time of the attack.  Compl. ¶ 4.1.  He witnessed the small boat approach and detonate next to the ship.  *Id.*  He "suffered Right Knee impaction on the flight deck of the ship as well as Flash-, Cervical Spine and Lumbar Spine injuries from the direct energy blast from the explosion."  Sealed Ex. T to First Supplement at 5, ECF No. 25-1.  The VA rates his left and right side nerve pain as 30% and 20% disabling, respectively, and scarring on his neck as 10% disabling.  *Id.* at 15–16.  He experiences chronic pain, asthma, chronic sinusitis, PTSD, anxiety, and depression.  *Id.* at 5.  In light of these facts, Plaintiff Matthew Saigger is entitled to base award of $5 million in pain and suffering damages.

19. <u>Fire Controlman 1st Class (Surface Warfare) Tremane Lide</u>:  Stationed aboard the Cole, Plaintiff Tremane Lide was located at the aft missile deck at the time of the attack.  Sealed Ex. U to First Supplement at 4–5, ECF No. 25-2.  He suffered from hearing loss because of the explosion.  *Id.* at 5.  The VA rates his PTSD as 30% disabling, and his tinnitus as 10% disabling, with an overall disability rating of 40%.  *Id.* at 12, 24.  In light of these facts, Plaintiff Tremane Lide is entitled to base award of $5 million in pain and suffering damages.

20. <u>Electrician's Mate 3rd Class Ryan Schmalz</u>:  Stationed aboard the Cole, Plaintiff Ryan Schmalz was laying in his berth at the time of the attack and responded to the

emergency in firefighting gear.  Sealed Ex. V to First Supplement at 6–7, ECF No. 25-3.  The VA rates his PTSD as 100% disabling.  *Id.* at 14.  His PTSD interfered with his ability to pursue a career as a firefighter, and he has been hospitalized for suicidal ideation.  *Id.* at 8.  In light of these facts, Plaintiff Ryan Schmalz is entitled to an upward adjustment to $6 million in pain and suffering damages.

21. Master-At-Arms 1st Class (Surface Warfare) Justin Crowe:  Stationed aboard the Cole, Plaintiff Justin Crowe secured the scene of the attack to preserve potential evidence and assisted with collection of body parts.  Sealed Ex. W to First Supplement at 5, ECF No. 25-4.  He experiences triggers from loud noises and certain smells, as well as recurring nightmares.  *Id.* at 6.  The VA rates his PTSD as 30% disabling and his tinnitus as 10% disabling, with an overall disability rating of 40%.  *Id.* at 13.  In light of these facts, Plaintiff Justin Crowe is entitled to the base award of $5 million in pain and suffering damages.

22. Command Master Chief James Parlier:  Stationed aboard the Cole, Plaintiff James Parlier was approximately 100 feet from the location of the explosion and provided medical care to dozens of sailors following the attack.  Sealed Ex. X to Supp. Mot. ("Second Supplement") at 6, ECF No. 25-5.  He treated sailors with traumatic injuries and put five of his shipmates into body bags.  *Id.*  He suffers from severe depression.  *Id.* at 7.  The VA rates his PTSD as 60% disabling, with an overall disability rating of 90%.  *Id.* at 21.  In light of these facts, Plaintiff James Parlier is entitled to an upward adjustment to $5.5 million in pain and suffering damages.

23. Petty Officer 2nd Class Lori Austin:  Stationed aboard the Cole, Plaintiff Lori Austin suffered a head injury and lost consciousness after the explosion caused her head to strike a wall.  Sealed Ex. Y to Second Supplement at 3, ECF No. 26-1.  She continues to experience vertigo and problems maintaining her balance.  *Id.* at 4.  The VA rates her PTSD as 70% disabling and her tinnitus as 10% disabling, and it has concluded that she is not employable.  *Id.* at 21–22.  In light of these facts, Plaintiff Lori Austin is entitled to an upward adjustment to $5.5 million in pain and suffering damages.

24. Petty Officer 2nd Class Terry Duff:  Stationed aboard the Cole, Plaintiff Terry Duff was located on the mess deck at the time of the attack.  Compl. ¶ 4.7.  He suffered bruising, lacerations, temporary blindness, and temporary deafness following the explosion.  Sealed Ex. Z to Second Supplement at 6, ECF No. 26-2.  He continues to experience painful shrapnel scars, patellofemoral pain syndrome in both knees, bursitis in his shoulders, tinnitus, and PTSD.  *Id.* at 7.  The VA rates his knee injuries as 50% disabling, his shoulder injuries as 40% disabling, his tinnitus as 10% disabling, and his PTSD as 70% disabling, with an overall disability rating of 100%.  *Id.* at 7, 12–13.  In light of these facts, Plaintiff Terry Duff is entitled to an upward adjustment to $6.5 million in pain and suffering damages.

25. Hull Maintenance Technician 3rd Class Aaron Toney:  Stationed aboard the Cole, Plaintiff Aaron Toney suffered shrapnel injuries because of the attack and experiences PTSD.  Sealed Ex. AA to Second Supplement at 4, ECF No. 26-3.  His injuries have interfered with his ability to maintain employment.  *Id.* at 5.  Due to his

PTSD, anxiety, and depression, the VA assigned him an overall disability rating of 70%. *Id.* at 5–6. In light of these facts, Plaintiff Aaron Toney is entitled to an upward adjustment to $5.5 million in pain and suffering damages.

26. <u>Petty Officer 2nd Class Carl Wingate</u>: Stationed aboard the Cole, Plaintiff Carl Wingate was thrown from his bunk as a result of the explosion and suffered herniated discs in his neck and back, an injured shoulder, and nerve damage. Sealed Ex. BB to Second Supplement at 6, ECF No. 26-4. The VA rates his PTSD as 70% disabling, with an overall disability rating of 100%. *Id.* at 7, 9. In light of these facts, Plaintiff Carl Wingate is entitled to an upward adjustment to $6 million in pain and suffering damages.

27. <u>David Morales</u>:[16] Stationed aboard the Cole, Plaintiff David Morales was thrown from his bunk as a result of the explosion and suffered a head injury. Sealed Ex. CC to Second Supplement at 3, ECF No. 26-5. He witnessed the injuries to several deceased sailors and assisted others with severe wounds. *Id.* The VA rates his PTSD and major depressive disorder as 70% disabling, his obstructive sleep apnea as 50% disabling, his cervical radiculopathy as 30% disabling on the left side and 20% disabling on the right side, and his tension headaches as 30% disabling. *Id.* at 6–7. In light of these facts, Plaintiff David Morales is entitled to an upward adjustment to $6 million in pain and suffering damages.

28. <u>Seaman Apprentice Edward Love</u>: Stationed aboard the Cole, Plaintiff Edward Love was located within 25 feet of the location of the explosion. Compl. ¶ 4.11. He experienced tinnitus, a ruptured right ear drum, and developed PTSD. Sealed Ex. DD to Second Supplement at 5, ECF No. 26-6. The VA rates his PTSD as 30% disabling and his tinnitus as 10% disabling, with an overall disability rating of 40%. *Id.* at 6, 8. In light of these facts, Plaintiff Edward Love is entitled to the base award of $5 million in pain and suffering damages.

29. <u>Petty Officer 3rd Class Eric Williams</u>: Stationed aboard the Cole, Plaintiff Eric Williams was stationed on the mess deck at the time of the attack, where he was hit by the blast and lost consciousness for 90 minutes. Compl. ¶ 4.12; Sealed Ex. EE to Second Supplement at 4, ECF No. 26-7. He experienced a head laceration, a Traumatic Brain Injury ("TBI"), a severe concussion, neck strain, and amnesia, and he has developed PTSD and chronic migraines. *Id.* He states that although many memories have returned, he still cannot recall events from his childhood. *Id.* The VA rates his PTSD as 30% disabling, his migraine headaches as 50% disabling, his neck pain as 20% disabling, and his tinnitus as 10% disabling, with an overall disability rating of 80%. *Id.* at 7, 9–10. In light of these facts, the Court finds that Plaintiff Eric Williams is entitled to an upward adjustment to $6 million in pain and suffering damages.

30. <u>Fireman Apprentice Gina Baenziger</u>: Stationed aboard the Cole, Plaintiff Gina Baenziger heard the explosion and responded to assist injured crewmembers. Sealed

---

[16] Plaintiff David Morales's rank and classification were not specified in the Complaint.

Ex. FF to Second Supplement at 4, ECF No. 26-8.  The attack impacted her mental health such that she was unable to continue her career in the Navy.  *Id.*  The VA rates her PTSD as 50% disabling.  *Id.*  In light of these facts, Plaintiff Gina Baenziger is entitled to the base award of $5 million in pain and suffering damages.

31. <u>Hull Maintenance Technician Fireman 3rd Class Jeremy Stewart</u>:  Stationed aboard the Cole, Plaintiff Jeremy Stewart was working in the galley at the time of the attack, when the explosion caused a head injury that rendered him unconscious.  Sealed Ex. GG to Second Supplement at 4, ECF No. 26-9.  He suffered broken bones in his arms and legs, as well as shrapnel along the right side of his body.  *Id.*  The explosion additionally caused a gastric rupture.  *Id.*  He was sedated and placed on a ventilator due to the severity of his injuries.  *Id.*  The VA rates his PTSD as 60% disabling.  *Id.*  In light of these facts, the Court finds that Plaintiff Jeremy Stewart is entitled to an upward adjustment to $6.5 million in pain and suffering damages.

32. <u>Electrician's Mate 3rd Class John Buckley III</u>:  Stationed aboard the Cole, Plaintiff John Buckley III was in a passageway approximately ten feet from the location of the explosion, where he was rendered unconscious and suffered a concussion.  Sealed Ex. HH to Second Supplement at 4–5, ECF No. 26-10.  He suffered fractures to both of his knees, hearing loss, and lower back trauma.  *Id.* 5.  The VA rates his PTSD as 100% disabling and previously rated his lower back pain, left patella tendonitis, and right patella tendonitis each as 10% disabling.  *Id.* at 10–11.  In light of these facts, the Court finds that Plaintiff John Buckley III is entitled to an upward adjustment to $6 million in pain and suffering damages.

33. <u>Machinery Repairman 2nd Class Rick Harrison</u>:  Stationed aboard the Cole, Plaintiff Rick Harrison was located within 50 feet of the explosion, which caused him to strike his head and injured his knees, back, and eardrums.  Sealed Ex. II to Second Supplement at 5, ECF No. 27-1.  He assisted injured crewmembers and inhaled smoke while working to extinguish fires resulting from the attack.  *Id.* at 6.  He was later diagnosed with compression of ten lower vertebrae, flattened arches in his feet, damage to the tympanic membrane in his right ear, a shoulder injury, and a severe concussion.  *Id.*  The VA rates his PTSD as 50% disabling, with an overall disability rating of 100%.  *Id.* at 26.  In light of these facts, the Court finds that Plaintiff Rick Harrison is entitled to an upward adjustment to $5.5 million in pain and suffering damages.

34. <u>Gas Turbine System Technician 2nd Class Robert McTureous</u>:  Stationed aboard the Cole, Plaintiff Robert McTureous was located close to the location of the explosion and climbed through the wreckage to escape a room filling with water.  Sealed Ex. JJ to Supp. Mot. ("Third Supplement") at 4, ECF No. 27-2.  He suffered second degree burns on his face, a fractured finger, ruptured eardrums, and shrapnel injuries.  *Id.* at 5.  He was diagnosed with PTSD, depression, anxiety, and night terrors.  *Id.*  The VA assigns him an overall disability rating of 70%.  *Id.* at 5, 11.  In light of these facts, the Court finds that Plaintiff Robert McTureous is entitled to an upward adjustment to $6 million in pain and suffering damages.

35. <u>Seaman Kay Moore</u>:  Stationed aboard the Cole, Plaintiff Kay Moore was approximately 50 feet from the location of the blast.  Sealed Ex. KK to Third Supplement at 6, ECF No. 27-3.  She suffered lacerations to her face and body, as well as fractured ribs, bruises, and nerve damage.  *Id.*  She has severe scarring on her face and body.  *Id.*  In addition, she witnessed the death of several shipmates and saw many other sailors injured and lying on the deck of the ship.  *Id.* at 6.  She experiences "anger, anxiety, problems maintaining personal relationships, and inability to keep long-term employment."  *Id.* at 7.  The VA rates her PTSD as 50% disabling, her headaches as 30% disabling, and her nerve pain as 20% disabling, with an overall disability rating of 80%.  *Id.* at 10–15.  In light of these facts, the Court finds that Plaintiff Kay Moore is entitled to an upward adjustment to $6 million in pain and suffering damages.

36. <u>Aviation Electronics Technician 2nd Class Corey Reier</u>:  Stationed aboard the Cole, Plaintiff Corey Reier was located at the forward CIWS mount at the time of the explosion, which threw him against a storage cabinet.  Ex. LL to Third Supplement at 7, ECF No. 34-3.  He helped use a chain hoist to lift equipment off injured crewmembers and later carried bodies of fallen Sailors off the ship.  *Id.*  He experiences nightmares, insomnia, irritability, and sensitivity to loud noises, as well as used alcohol as a coping mechanism.  *Id.* at 7–8.  In light of these facts, Plaintiff Corey Reier is entitled to the base award of $5 million in pain and suffering damages.

37. <u>Sonar Technician 2nd Class Jessica Kritzas</u>:  Stationed aboard the Cole, Plaintiff Jessica Kritzas was in the mess at the time of the explosion, which threw her against the bulkhead and injured her neck and spine.  Compl. ¶ 4.20.  The injuries resulted in chronic migraines, as well as numbness in her extremities, tremors in her hands, and facial muscle spasms.  Sealed Ex. MM to Third Supplement at 4, ECF No. 27-4.  She experiences panic attacks in crowds and memory loss resulting from PTSD and explains that she is "in constant pain" and "extremely fatigued."  *Id.* at 5.  The VA rates her PTSD as 50% disabling, upper radicular nerve paralysis as 30% disabling, and intervertebral disc syndrome as 20% disabling, with an overall disability rating of 80%.  *Id.* at 4, 33.  In light of these facts, the Court finds that Plaintiff Jessica Kritzas is entitled to an upward adjustment to $6 million in pain and suffering damages.

38. <u>Chief Gas Turbine Systems Technician Elroy Newton</u>:  Stationed aboard the Cole, Plaintiff Elroy Newton was at the forward starboard refueling station at the time of the attack.  Sealed Ex. NN to Third Supplement at 4, ECF No. 28-1.  He is "forever changed and haunted by the effects of the bombing of the USS Cole."  *Id.*  Among other service-connected conditions, the VA rates his PTSD as 30% disabling, and tinnitus as 10% disabling.  *Id.* at 4, 16–17.  In light of these facts, Plaintiff Elroy Newton is entitled to the base award of $5 million in pain and suffering damages.

39. <u>Chief Boatswain's Mate (Surface Warfare) Eric Kafka</u>:  Stationed aboard the Cole, Plaintiff Eric Kafka was rendered unconscious after a television and steel supporting racks fell off the wall and struck him following the explosion.  Sealed Ex. OO to Third Supplement at 5, ECF No. 28-2.  His "PTSD, anxiety, and severe depression have impacted [his] work, interactions with other people, and it has been a drastic

strain on [his] family relationships." *Id.* The VA rates his PTSD as 70% disabling, with an overall disability rating of 80%. *Id.* at 21. In light of these facts, Plaintiff Eric Kafka is entitled to the base award of $5 million in pain and suffering damages.[17]

40. <u>Petty Officer 3rd Class Jamisha Davis</u>: Stationed aboard the Cole, Plaintiff Jamisha Davis was in her bedroom at the time of the explosion, which knocked her to the floor onto her left shoulder, causing repeated dislocations over the ensuing years. Sealed Ex. PP to Supp. Mot. ("Fourth Supplement") at 5, ECF No. 29-1. As a result of the attack, she experiences depression, anxiety, feelings of detachment from others, social impairment, diminished participation in activities, poor sleep, and headaches. *Id.* She explains that when she is "around people," she "experience[s] unusual anger and irritability," and that her "family has borne the brunt of [her] mood swings and suffered through this over the years." *Id.* at 6. The VA rates her PTSD as 50% disabling. *Id.* at 5, 30. In light of these facts, Plaintiff Jamisha Davis is entitled to the base award of $5 million in pain and suffering damages.

    i.   <u>Chauntavia Peterkin</u>: The daughter of Plaintiff Jamisha Davis, Plaintiff Chauntavia Peterkin, states that her mother was "loving" and that she "depended on her and she always made [her] happy." *Id.* at 15. After the attack, she noticed that her "mother would get anxious and depressed around the anniversary of the Cole attack." *Id.* Her mother "has more anxiety than before the attack based on what my family has told [her] she was like before." *Id.* "After the Cole attack, [her] mom would sometimes isolate herself and she would get depressed." *Id.* She explains that her mother "would get upset quicker and did not have the patience she did before." *Id.* Because she was young at the time of the attack, she "missed out on the person [her mother] was before the Attack because of the way the guilt, anxiety, and depression from [her] constant reliving the Attack has changed her." *Id.* at 16. In light of these facts, the Court finds that Plaintiff Chauntavia Peterkin is entitled to the base award of $2.5 million in solatium damages.

    ii.  <u>Dwight Thompson</u>: The father of Plaintiff Jamisha Davis, Plaintiff Dwight Thompson, states that they were "a tight-knit family" and "had a close relationship" at the time of the attack. *Id.* at 10. He explains that his daughter "has changed a lot" as a result of the attack, that she "sometimes is withdrawn and does not communicate as much," and that he "can tell the USS Cole Attack still weighs on her to this day." *Id.* His "life has been affected tremendously" and he "feel[s] the need to be in close contact with her everyday due to her health and mental state." *Id.* at 11. In light of these facts, the Court finds that Plaintiff Dwight Thompson is entitled to the base award of $2.5 million in solatium damages.

---

[17] The Complaint also lists Petty Officer Third Class Richard E. Smith, a Sailor stationed aboard the nearby U.S.S. Dextrous, as a Plaintiff, but Richard E. Smith does not appear in Plaintiffs' default judgment filings, including the spreadsheet identifying damages suffered by each Plaintiff. *See* Compl. ¶ 4.23; Ex. A to Pls.' Mot.; Ex. B. to Pls,' Mot.

iii. <u>Latoya Brown</u>:  The sister of Plaintiff Jamisha Davis, Plaintiff Latoya Brown states that as children they "were always together" and that "one didn't go anywhere without the other." *Id.* at 19.  "At the time of the Attack, [they] were still as close as [they] had always been," and she had guardianship over her niece Chauntavia.  *Id.*  She was "devastated" when she learned of the attack and "was depressed and really had to push through the anxiety of it all to continue to take care of [her] son and niece." *Id.*  She explains that "[e]ven the length of time that has passed and all the love [she and her family have] shown her haven't healed her [sister's] wounds." *Id.* at 20.  In light of these facts, the Court finds that Plaintiff Latoya Brown is entitled to the base award of $1.25 million in solatium damages.

41. <u>Quartermaster Navigation 3rd Class Christopher Nolf</u>:  Stationed aboard the Cole, Plaintiff Christopher Nolf was in the chart room at the time of the attack, where the explosion caused electronics to fall on his head.  Sealed Ex. QQ to Fourth Supplement at 7, ECF No. 29-2.  He provided medical attention to wounded sailors and witnessed several close friends with fatal injuries. *Id.* at 7–8.  When responding to the attack, he "smashed multiple parts of [his] body against the steel throughout the ship." *Id.* at 8.  He later felt "depressed and hopeless, had crying spells, and had difficulty concentrating and remembering things." *Id.* at 7.  The VA rates his PTSD as 30% disabling, and conditions affecting each knee as 10% disabling. *Id.* at 6, 22, 26.  In light of these facts, Plaintiff Christopher Nolf is entitled to the base award of $5 million in pain and suffering damages.

i. <u>Gail Nolf</u>:  The mother of Plaintiff Christopher Nolf, Plaintiff Gail Nolf, states that their "mother-son relationship remained very good as he grew into a young man" and that they "were always concerned for each other." *Id.* at 11.  She explains that following the attack, her "son is much more withdrawn than he was before" and "is angry in his own quiet ways, less conversational, and seems to always be guarded in talking and interacting with others." *Id.*  "The thing that [she] miss[es] most about Christopher's personality before the Attack is what a happy and go lucky type of guy he was." *Id.*  "[I]n dealing with the long-term impact of the tragic event on his life and [her] life, the emotions that [she] felt due to having to watch him deal with the pains in his life it caused has [had] a huge toll on [her] mental and emotional well-being too." *Id.* at 12.  In light of these facts, the Court finds that Plaintiff Gail Nolf is entitled to the base award of $2.5 million in solatium damages.

ii. <u>Gregory Nolf</u>:  The brother of Plaintiff Christopher Nolf, Plaintiff Gregory Nolf, states that their "childhood growing up was full of fun, happiness, and love," and that they "were still very close, even after he had left for service in the Navy." *Id.* at 15.  After the attack, he initially "thought that [his] brother was dead." *Id.*  He explains that his brother "is much quieter and more withdrawn than he was before the Attack," and that he "miss[es] doing all sorts of fun activities together like [they] did growing up." *Id.*  "Chris had changed a lot both emotionally and physically," and "[d]ue to his knee injuries, he is limited in the physical activities that [they] once enjoyed

together, and he can't go to any of the social gatherings that [they] used to enjoy because of his PTSD and the anxiety." *Id.* "A part of him stayed on that ship after the Attack." *Id.* In light of these facts, the Court finds that Plaintiff Gregory Nolf is entitled to the base award of $1.25 million in solatium damages.

42. Senior Chief Gas Turbine Systems Technician Keith Lorensen: Stationed aboard the Cole, Plaintiff Keith Lorensen was in the mess at the time of the attack, approximately 15 feet from the site of the explosion, and was thrown across the room. Sealed Ex. RR to Fourth Supplement at 8, ECF No. 29-3. He suffered a right femur fracture that severed his femoral artery, contusions to his left leg, a laceration to his upper lip, a closed head injury, a wrist fracture, and a shoulder injury. *Id.* He explains that "[p]hysical limitations due to permanent loss of range of motion prevents some activities [he] used to enjoy" and that "severe leg pain prevents sleeping or wakes" him. *Id.* at 10. He has "nightmares" that "vary in frequency" and result in "periodic insomnia." *Id.* He experiences "palpitations" when recounting the attack and has an "extraordinary sensitivity to being startled." *Id.* He explains that his "loved ones are guarded around [him] and admittedly will avoid [him] sometimes because they don't like triggering the response." *Id.* "The emotional impact the Attack had on [his] life is significant, permanent, and ongoing," and he experiences difficulty with "social engagement" and "paranoia." *Id.* The VA rates his PTSD as 30% disabling and his tinnitus as 10% disabling, with an overall disability rating of 60%. In light of these facts, the Court finds that Plaintiff Keith Lorensen is entitled to an upward adjustment to $6 million in pain and suffering damages.

    i.  Lisa Lorensen: The spouse of Plaintiff Keith Lorensen, Plaintiff Lisa Lorensen, states that their "family was deeply impacted by the events due to the simple fact that all of [them] were thrust into a public sphere, media fervency, and under a microscope from the worldwide continuous coverage of the news story." *Id.* at 13. They "had to navigate the emotional and physical aspects of the injuries Keith sustained." *Id.* She explains that she "was the Ombudsman for USS Cole at the time of the bombing" and that she "provided counseling, which required [her] to take on and process the difficulties that other sailors faced." *Id.* The family "continuously ha[s] lingering effects of the emotional trauma daily." *Id.* In light of these facts, the Court finds that Plaintiff Lisa Lorensen is entitled to the base award of $4 million in solatium damages.

43. Boatswain's Mate 2nd Class Martin Songer: Stationed aboard the Cole, Plaintiff Martin Songer was in the boatswain workshop approximately 150 feet away from the location of the blast, which threw him against the bulkhead and caused equipment to fall on his head. Ex. SS to Fourth Supplement at 4, ECF No. 35-4. When investigating the extent of the damage to the ship, he found several of his shipmates who died in the attack. *Id.* He explains that "[e]very year around October [his] anxiety gets worse" and he is "filled with sadness and memories of [his] shipmates and their families." *Id.* In light of these facts, Plaintiff Martin Songer is entitled to the base award of $5 million in pain and suffering damages.

      i.   <u>Shelly Songer</u>:  The wife of Plaintiff Martin Songer, Plaintiff Shelly Songer, states that after she learned of the attack, "[t]he thought of losing [her] husband and waiting to learn if he w[as] alive caused [her] severe emotional distress." *Id.* at 7.  She soon "learned Martin had survived, but he was not the same person." *Id.*  She "continue[s] to struggle with severe emotional stress because of this senseless act." *Id.*  "Living with Martin's trauma, as well as [her] own, has forced [her] to be mindful of his moods at all times." *Id.*  She explains that he is often "very anxious" and "became far more isolated from" her. *Id.*  In light of these facts, Plaintiff Shelly Songer is entitled to the base award of $5 million in pain and suffering damages.

44. <u>Gas Turbine Systems Technician 1st Class Kathie Brister</u>:  Stationed aboard the Cole, Plaintiff Kathie Brister was in the oil lab approximately 20 feet away from the location of the blast.  Sealed Ex. TT to Fourth Supplement at 2, 5, ECF No. 30-1.  She suffered burns to her face, neck, arms, and legs, as well as ruptured ear drums and spinal discs. *Id.*  She developed pneumonia while waiting for skin grafts. *Id.*  It took approximately two years for her skin to heal from the burns, and she is left with permanent scarring. *Id.*  She "essentially lost everything [she] ever worked for and loved, because of the USS Cole attack." *Id.*  She experiences "paranoia" and "agoraphobia," and spent "20 years heavily medicated on opioid pain meds and every pill imaginable in the depression and PTSD arsenal, resulting in a complete inability to function." *Id.*  The VA rates her PTSD as 100% disabling, the burn scarring on her neck and face as 30% disabling, burn scarring on her left hand and arm as 20% disabling, migraine headaches as 30% disabling, cervical spine injury as 10% disabling, and tinnitus as 10% disabling. *Id.* at 5, 13–15.  In light of these facts, the Court finds that Plaintiff Kathie Brister is entitled to an upward adjustment to $7 million in pain and suffering damages.

      i.   <u>Andy Lopez</u>:  The former husband of Plaintiff Kathie Brister, Plaintiff Andy Lopez, states that "[t]he attack on the USS Cole forever changed [him]," and that "[t]he images of the skin peeling off of [his] then wife['s] face, legs, fingers, and arms from the explosion burns were extremely traumatizing." *Id.* at 8.  He and his children have "been diagnosed with PTSD" and "suffer from separation anxiety." *Id.*  "Prior to the USS Cole attack," he and his wife "had a loving relationship and she was a great mother," but "emotional and physical injuries . . . dramatically changed how she treated both [him] and [their] children." *Id.*  These changes included PTSD, "volatile mood swings," and "addictive tendencies and substance abuse issues" that "caused permanent schisms within [their] family dynamic." *Id.*  "[T]he attack on the USS Cole played a significant role in the dissolution of [their] marriage." *Id.*  In light of these facts, Plaintiff Andy Lopez is entitled to an upward adjustment to $5 million in solatium damages.

45. <u>Estate of Operations Specialist 3rd Class Rubin Smith</u>:  Stationed aboard the Cole, Rubin Smith was lying in his bunk at the time of the explosion and was thrown to the floor.  Compl. ¶ 4.37.  The impact dislocated and tore nerves in his ankle, and he later suffered from PTSD and anxiety. *Id.*  The VA assigned him an overall disability

rating of 50%.  Ex. UU to Supp. Mot. ("Fifth Supplement") at 8, ECF No. 36-1.  In light of these facts, the Rubin Smith Estate is entitled to the base award of $5 million in pain and suffering damages.[18]

46. <u>Damage Controlman Fireman Sean Powell</u>:  Stationed aboard the Cole, Plaintiff Sean Powell was in the filter shop at the time of the explosion, which knocked him unconscious.  Ex. VV to Fifth Supplement at 9, ECF No. 36-2.  After regaining consciousness, he assisted injured Sailors and performed damage control but eventually became unable to walk.  *Id.* at 9–10.  He suffered a right ankle fracture, head trauma, loss of consciousness, smoke inhalation, and PTSD.  *Id.* at 8.  "The images from all the gore that [he] witnessed [are] forever imprinted on [his] mind."  *Id.* at 10.  He explains that after the attack, he "felt abandoned and unsupported," *id.*, and "did not receive any support for the mental trauma [he] experienced," *id.* at 11. He "turned to alcohol and heavily relied on it" and was discharged from the Navy following a court martial for marijuana use.  *Id.* .  As a result, he is unable to access VA services.  *Id.*  He continues to suffer from PTSD.  *Id.*  In light of these facts, Plaintiff Sean Powell is entitled to the base award of $5 million in pain and suffering damages.

    i.  <u>Kenya Powell</u>:  The mother of Plaintiff Sean Powell, Plaintiff Kenya Powell, states that her relationship with her son "was very good" at the time of the attack, and that he was "so carefree and trusting."  *Id.* at 14.  She explains that "[t]he Attack has made him so paranoid and distrustful," and that he "has a hard time letting his guard down and he is always much more aware and hypersensitive to people around him all the time."  *Id.*  Because he "is not comfortable being confined to small spaces" and "can't be around large crowds, or loud, unexpected noises," they must "take these concerns into consideration for any family activities."  *Id.* at 15.  In light of these facts, the Court finds that Plaintiff Kenya Powell is entitled to the base award of $2.5 million in solatium damages.

    ii.  <u>Steven Powell</u>:  The father of Plaintiff Sean Powell, Plaintiff Steven Powell, states that he "was a stay-at-home dad during Sean's childhood and teenage years," and that they "had a very close father/son relationship."  *Id.* at 18.  He would "visit as often as possible when [his son] was on leave."  *Id.*  When he learned of the attack, he "was overwhelmed with thoughts of dread" and "was so worried that [his] son was gone."  *Id.*  He explains that "Sean never talks about the USS Cole bombing, and he seems to hold back all of his emotions about this tragic event."  *Id.*  He "miss[es] Sean being able to open up to [him] about difficult parts of his life and being able to be there for him."  *Id.* at 18–19.  When the family goes to events together, "Sean is always on guard, hypersensitive and aware of his surroundings and all of the people that are present wherever [they] go."  *Id.* at 19.  In light of these facts, the Court finds

---

[18] Plaintiff Tracy Smith voluntarily dismissed claims against Iran in this action without prejudice.  *See* ECF No. 19.

that Plaintiff Steven Powell is entitled to the base award of $2.5 million in solatium damages.

    iii.  <u>Ashley Misch</u>:  The sister of Plaintiff Sean Powell, Plaintiff Ashley Misch, states that "[s]ince [she] was his little sister, [she] always looked up to him" and "always wanted to be where he was." *Id.* at 22.  When her father told her about the attack, the family did not "know if he is alive, dead, or wounded," and she "started to uncontrollably cry and shake on the ground." *Id.*  "[T]he Attack significantly changed [her] brother," as he now "gets very anxious around or in large crowds" and "has several health issues due to the Attack." *Id.*  Whereas they previously "spoke on a daily basis and had such fun, uplifting conversations because he was so full of life . . . [s]ince the day of the Attack, he has been withdrawn from our family for some moments and he seems to always have his guard up." *Id.*  She now does not "get to see him as often as [she] would like to or as much as [she] used to before the Attack." *Id.*  In light of these facts, the Court finds that Plaintiff Ashley Misch is entitled to the base award of $1.25 million in solatium damages.

47.  <u>Chief Fire Controlman (Surface Warfare) Jeffrey Vinneau</u>:  Stationed aboard the Cole, Plaintiff Jeffrey Vinneau was in the mess at the time of the explosion, the force of which threw his head against a pipe.  Sealed Ex. WW to Fifth Supplement at 9, ECF No. 30-2.  He fell unconscious and later awoke in a hospital in Yemen. *Id.*  He suffered a "[s]evere concussion and almost a broken skull, smoke inhalation, and a twisted knee and ankle." *Id.* at 10.  The VA rates his migraines as 50% disabling, his PTSD as 30% disabling, and his vertigo as 30% disabling, with an overall disability rating of 80%. *Id.* at 26–27.  In light of these facts, Plaintiff Jeffrey Vinneau is entitled to the base award of $5 million in pain and suffering damages.

    i.  <u>Linda Vinneau</u>:  The former wife of Plaintiff Jeffrey Vinneau, Plaintiff Linda Vinneau, states that she married him in 1991 and that their "relationship was good," as they "had a happy family with two children." *Id.* at 14.  She explains that the attack "changed him in all aspects of his life." *Id.* at 15.  "[H]e became more distant," was "verbally, emotionally, mentally, and physically abusive," and "began to drink more." *Id.*  The attack "destroyed [their] relationship," and they divorced in 2013. *Id.*  She continues to suffer from PTSD, depression, and severe anxiety. *Id.* at 14.  In light of these facts, the Court finds that Plaintiff Linda Vinneau is entitled to an upward adjustment to $5 million in solatium damages.

    ii.  <u>Lauren Crago</u>:  The daughter of Plaintiff Jeffrey Vinneau, Plaintiff Lauren Crago, states that she was "only six years old" at the time of the attack and "was happy to talk to [her] father when [she] could, mostly looking forward to him returning home." *Id.*  She explains that "[t]he Attack changed [her] father forever." *Id.* at 18.  "He was much different when he returned home" and "seemed to be sad a lot more and he couldn't play with [them] the way he used to prior to the Attack." *Id.*  "[E]ven being so young, [they] could tell that he wasn't the same." *Id.*  In light of these facts, the Court finds that Plaintiff

Lauren Crago is entitled to the base award of $2.5 million in solatium damages.

48. <u>Master Chief Sonar Technician (Surface Warfare) Paul Abney</u>:  Stationed aboard the Cole, Plaintiff Paul Abney was in the mess approximately 20 feet from the location of the explosion.  Sealed Ex. XX to Fifth Supplement at 7, ECF No. 30-3.  He suffered a traumatic brain injury and continues to experience severe memory problems and difficulty carrying on conversations.  *Id.* at 7, 9.  He explains that "[t]he first 4 - 7 years following the USS Cole bombing were likely the worst in [his] life."  *Id.*  His marriage deteriorated, and he and his wife divorced in 2007.  *Id.*  The VA rates his TBI and PTSD as 100% disabling.  *Id.* at 8.  In light of these facts, the Court finds that Plaintiff Paul Abney is entitled to an upward adjustment to $6 million in pain and suffering damages.

    i.   <u>Madeline Turlich-King</u>:  The daughter of Plaintiff Paul Abney, Plaintiff Madeline Turlich-King, states that her "relationship with [her] dad during [her] childhood was amazing," and that he "was super involved in [her] life." *Id.* at 13.  At the time of the attack, their relationship was still "very good" and she "miss[ed] him" when he went on deployment.  *Id.*  The family "would track where he was on a globe," and "[h]e would call whenever he could and would tell [her] about where he had been so far."  *Id.* at 13–14.  She found out about the attack when she came home from school and knew "that some people had died or been seriously injured, but [she] didn't know if [her] dad was one of them."  *Id.* at 14.  "After the Attack [her] relationship with [her] dad changed significantly."  *Id.*  Her "parents' marriage got increasingly tense" and her "mom and dad fought often."  *Id.*  They "would wake up in the morning to things broken and even holes in the walls."  *Id.*  Her "dad was less involved in [her] life after the Attack," and "he wasn't mentally or emotionally present anymore."  *Id.* at 14–15.  She explains that he "has problems with memory" and "can't talk about anything remotely serious without starting to cry."  *Id.* at 15.  She explains that she does not "talk to [her] dad as much as [she] would like to," that they "only talk about twice a month, and [she] only get[s] to see him once every few years."  *Id.*  In light of these facts, the Court finds that Plaintiff Madeline Turlich-King is entitled to the base award of $2.5 million in solatium damages.

    ii.   <u>Amelia Thompson</u>:  The daughter of Plaintiff Paul Abney, Plaintiff Amelia Thompson, states that "most of [her] fond memories of him come from" her childhood, and that while she "dreaded him going on deployments," "when he was home, he would always make up for it."  *Id.* at 19.  "He was [her] favorite person," *id.*, and she "had a very strong bond with [her] dad before the USS Cole Attack," *id.* at 20.  During holidays, "[t]here was always a tinge of envy triggered in [her] when [she] would see [her] friends' families with their fathers who were still wholly present."  *Id.*  Her "dad has basically become an entirely different person since before the Attack," and her "biggest memory from immediately after the Attacks was that he was angrier."  *Id.*  "He was serious, somber, irritable, and distant," *id.*, and "spent long hours at work,

sometimes not seeing [them] for days at a time," *id.* at 21.  She also experienced "a significant decline in [her] school performance" and "failed friendships and relationships throughout adulthood as a result of [her] negatively impacted relationship with [her] father." *Id.*  In light of these facts, the Court finds that Plaintiff Amelia Thompson is entitled to the base award of $2.5 million in solatium damages.

49. <u>Fire Controlman 2nd Class Chadwick Atwood</u>:  Stationed aboard the Cole, Plaintiff Chadwick Atwood was in an equipment room at the time of the blast and donned an oxygen tank in response to the ensuing smoke.  Sealed Ex. YY to Fifth Supplement at 5, ECF No. 30-4.  In the following days, he experienced "severe diarrhea, dehydration, and food pois[on]ing" due to "[t]he chemicals and germs on [his] hands." *Id.*  Following the attack, he "experienced many mental problems" and "drank heavily" as a coping mechanism. *Id.*  He has "spent years wishing [he] had saved everyone." *Id.* at 7.  He now "cannot cope with conflict," "PTSD affects [his] personal relationships," and he sometimes cannot "stop [his] anger." *Id.* at 7–8.  He has received treatment for depression and PTSD. *Id.* at 21.  In light of these facts, Plaintiff Chadwick Atwood is entitled to the base award of $5 million in pain and suffering damages.

     i.  <u>Gayla Wilson</u>:  The mother of Plaintiff Chadwick Atwood, Plaintiff Gayla Wilson, states that her "relationship" with her son "was very good" and that she "missed him a lot when he was deployed." *Id.* at 11.  When she learned of the attack, she "thought that [she] had lost [her] only son" and remained "terrified there might be another attack." *Id.*  She explains that "[t]he Attack has made Chad paranoid and distrustful," and that "[h]e now hides his feelings and has been very moody ever since he returned home." *Id.* at 12.  She "miss[es] so much his love of normal life and spontaneity he used to possess." *Id.*  She "feel[s] like [she] should have protected him better," and she "was diagnosed with severe depression." *Id.*  In light of these facts, the Court finds that Plaintiff Gayla Wilson is entitled to the base award of $2.5 million in solatium damages.

    ii.  <u>Heather Nickell</u>:  The sister of Plaintiff Chadwick Atwood, Plaintiff Heather Nickel, states that he was her "only sibling," that they "saw each other as often as [they] could when he was home, and [they] spoke on the phone as often as possible." *Id.* at 16.  She explains that "the Attack significantly changed [her] brother," and that "it has still stayed with him through all of these years since then." *Id.*  "He became much more reserved with sharing what happened to him and [they] no longer had the open conversations that [they] were able to have before the Attack." *Id.* at 16–17.  In light of these facts, the Court finds that Plaintiff Heather Nickell is entitled to the base award of $1.25 million in solatium damages.

50. <u>Engineman 2nd Class Jason Phillips</u>:  Stationed aboard the Cole, Plaintiff Jason Phillips was exercising at the time of the blast, which threw him from the treadmill onto the ground.  Sealed Ex. ZZ to Fifth Supplement at 5, ECF No. 30-5.  He

responded to the engine room to mitigate damage to the failing shaft seal, where contact with contaminated water caused an infection. *Id.* He witnessed the remains of his fellow sailors and continues to suffer from depression, acute anxiety, PTSD, and substance abuse. *Id.* He explains that he has "been unable to maintain healthy relationships with anyone" and has "two failed marriages, and numerous failed relationships. *Id.* He has also been "[un]able to keep any job for a significant amount of time." *Id.* at 6. The VA rates his PTSD as 70% disabling. *Id* at 13. In light of these facts, Plaintiff Jason Phillips is entitled to the base award of $5 million in pain and suffering damages.

    i. <u>Mary Phillips-McNamara</u>: The mother of Plaintiff Jason Phillips, Plaintiff Mary Phillips-McNamara, states that her son "had a very normal childhood" and "he would call [her] frequently and keep in contact while he was in the Navy." *Id.* at 8. Following the attack, she "ha[s] tried over and over again to get him to be himself, the same fun-loving and carefree person he was before the Attack," but that he has often "resisted seeking help." *Id.* at 9. She explains that he has become "distant" and "doesn't share any of his thoughts or feelings." *Id.* The "fight" to support her son's treatment for substance abuse "pays its toll on this mother watching her son go through this." *Id.* In light of these facts, the Court finds that Plaintiff Mary Phillips-McNamara is entitled to the base award of $2.5 million in solatium damages.

51. <u>Chief Quartermaster (Surface Warfare) Michael Russell</u>: Stationed aboard the Cole, Plaintiff Michael Russell was in the mess at the time of the attack, suffered head trauma, and was rendered unconscious. Compl. ¶ 4.55; Sealed Ex. AAA to Fifth Supplement at 5–6, ECF No. 30-6. Following the attack, he no longer engages in activities he previously found enjoyable, including attending social gatherings and participating in sports. *Id.* at 6–7. The effects of the attack strained his marriage and relationship with his family, such that his "kids did not want to be around [him]." *Id.* at 7. He experiences depression, anxiety, panic attacks, chronic sleep impairment, memory loss, and problems communicating, among other conditions. *Id.* at 9. The VA rates his PTSD as 70% disabling, his sleep apnea as 50% disabling, his scalp scarring as 10% disabling, his TBI as 10% disabling, and two spinal injuries as 10% and 20% disabling, respectively, with and overall disability rating of 100%. *Id.* at 6. In light of these facts, Plaintiff Michael Russell is entitled to an upward adjustment to $6 million in pain and suffering damages.

    i. <u>Michelle Russell</u>: The spouse of Michael Russell, Plaintiff Michelle Russell, states that when they married, "[h]e was charming, smart, funny, and good looking," *id.* at 11, and that at the time of the attack they "had a happy family with 2 kids" and "were the picture of the ideal American family," *id.* at 12. She explains that the attack "changed him in all aspects of his life," and that "he has anger, depression, anxiety, and social detachment that was not present before the bombing." *Id.* "[H]e keeps his feelings to himself and doesn't express his thoughts or feelings with [her]," and "he doesn't have the desire or urge to be spontaneous or want to do new things." *Id.* Their "relationship has been strained since the accident, as well as his relationship with [their] kids."

*Id.* "His PTSD has taken a toll on [their] family and relationship," as well. *Id.* In light of these facts, the Court finds that Plaintiff Michelle Russell is entitled to the base award of $4 million in solatium damages.

ii. <u>Christian Russell</u>:  The son of Plaintiff Michael Russell, Plaintiff Christian Russell, states that he remembers his "father always laughing and joking around with everybody having a great time," and that he was "always just be ready for the next time [his father] came home and looking forward to family time." *Id.* at 22.  He explains that his "father is not the same after the attack, but "is more distant, non-emotional or family oriented." *Id.*  He "miss[es] the fun father that would laugh and joke around." *Id.*  He also wishes his father could have "showed [him] how to show emotion, or to react in a better way," that may have mitigated his own issues with substance abuse. *Id.* at 23.  In light of these facts, the Court finds that Plaintiff Christian Russell is entitled to the base award of $2.5 million in solatium damages.

iii. <u>Karissa Teeter</u>:  The daughter of Plaintiff Michael Russell, Plaintiff Karissa Teeter, states that after the attack, her "relationship with [her] father has been forever changed," and that "the man that got off that plane was no longer [her] father that left prior to deployment." *Id.* at 17.  She expresses that "The day the attack happened[, her] father died." *Id.*  She "miss[es] . . . the love he expressed to [her] before the Attack," as "he no longer shows or expresses his feelings." *Id.* at 18.  In comparison to during her childhood, her father now "is constantly on edge," and "very uptight and high-str[u]ng." *Id.* at 15.  She explains that their "father and daughter relationship also was heavily impacted," that they "no longer had the relationship and bond [they] once had." *Id.*  As a result, she "moved in with [her] maternal grandparents for a short period of time." *Id.* at 16.  In light of these facts, the Court finds that Plaintiff Karissa Teeter is entitled to the base award of $2.5 million in solatium damages.

3. Prejudgment Interest

Whether to award prejudgment interest is "subject to the discretion of the court and equitable considerations." *Oldham v. Korean Air Lines Co.*, 127 F.3d 43, 54 (D.C. Cir. 1997) (quotation and citation omitted).  Because "[p]rejudgment interest is an element of complete compensation," *West Virginia v. United States*, 479 U.S. 305, 310 (1987) (citing *Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 655 & n.10 (1983)), it should be denied "[w]hen an award without prejudgment interest fully compensates a plaintiff." *Wyatt v. Syrian Arab Republic*, 908

F. Supp. 2d 216, 232 (D.D.C. 2012), *aff'd*, 554 F. App'x 16 (D.C. Cir. 2014) (quoting *Price v. Socialist People's Libyan Arab Jamahiriya*, 384 F. Supp. 2d 120, 135 (D.D.C. 2005)).

As the Court explained in detail in *Barry v. Islamic Republic of Iran (Barry II)*, 437 F. Supp. 3d 15 (D.D.C. 2020), "[c]ourts in this Circuit have split on whether an award of prejudgment interest on compensatory damages is appropriate in FSIA suits," and "[w]here courts have made such an award, they have generally justified it based on a delay between the time of the attack giving rise to the injury and the time at which the claimants received relief." *Id.* at 60–62 (listing examples). However, drawing on guidance from the Restatement of Torts, the Court found that "fundamental principles of tort law . . . cut against the award of interest" for pain and suffering or solatium damages, especially because the calculation of those damages should already account for any additional suffering during the delay between the original injury and the damages award. *Id.* at 61–62; *see also Ben-Yishai v. Syrian Arab Republic*, No. 18-cv-3150, 2022 WL 17250344, at *16 (D.D.C. Nov. 28, 2022) (declining the award prejudgment interest on solatium damages because "the *Heiser* framework represents a calculation of the appropriate level of compensation, regardless of an attack's timing"). The Court adopts the *Barry II* analysis here and declines to award prejudgment interest.

### 4.   Punitive Damages

The Supreme Court "decided that [retroactive] punitive damages *are* permissible for federal claims" brought under 28 U.S.C. § 1605A. *Opati v. Republic of Sudan*, 140 S Ct. 1601, 1610 (2020). Thus, because all Plaintiffs here properly bring their claims under the federal private right of action established by section 1605A(c), *see supra* Section IV.C at n.9, they are eligible to seek punitive damages. "Courts calculate the proper amount of punitive damages by considering four factors: '(1) the character of the defendants' act, (2) the nature and extent of

harm to the plaintiffs that the defendants caused or intended to cause, (3) the need for deterrence, and (4) the wealth of the defendants.'" *Opati v. Republic of Sudan*, 60 F. Supp. 3d 68, 81 (D.D.C. 2014) (citation omitted); *Flatow*, 999 F. Supp. at 32 (identifying these four factors as governing punitive damages under "[g]eneral principles of tort law" (citing RESTATEMENT (SECOND) OF TORTS § 908)), abrogated on other grounds *Haim v. Islamic Republic of Iran*, 425 F. Supp. 2d 56, 71 n.2 (D.D.C. 2006).

As another court in this District recently explained,

> [t]his District has developed three primary methods of calculating punitive damages in FSIA cases.  The first, used more commonly in mass-casualty events, involves multiplying the foreign state's "annual expenditures on terrorism" by a factor between three and five.  The second approach awards a fixed amount of $150 million per affected family.  The third approach involves multiplying the total compensatory damages award by a factor of between one and five.  The multiplier approach is especially appropriate when the defendants "did not directly carry out the attack, but funded [a proxy actor], [and] it is doubtful whether a large amount . . . would have the deterrent effect that it might have had in times past."

*Ben-Yishai*, 2022 WL 17250344, at *15 (citations omitted).  Plaintiffs suggest, and the Court agrees, that the third approach is most appropriate here.  *See* Proposed Damages Chart at 1 n.2. Plaintiffs request a ratio of "3:1 punitive-to-compensatory damages," *id.*, and the Court adopts this approach, as a "multiplier of three" is the "usual practice in state sponsored terrorism cases," *Roth v. Syrian Arab Republic*, No. 14-cv-1946, 2018 WL 4680270, at *17 (D.D.C. Sept. 28, 2018).[19]  Accordingly, the court awards $1,467,000,000 in punitive damages, which is three times the combined total of $489,000,000 awarded in compensatory damages.  *See infra* Annex.

---

[19] Punitive damages were previously awarded against Iran for the Cole bombing in *Flanagan*.  *See* 87 F. Supp. 3d at 126–27.  While "[r]ecurrent awards in case after case arising out of the same facts can financially cripple a defendant, over-punishing the same conduct through repeated awards with little additional deterrent effect," these concerns are not overriding here.  *Murphy v. Islamic Republic of Iran*, 740 F. Supp. 2d 51, 81 (D.D.C. 2010).  First, *Flanagan* involved only five Plaintiffs—family members of one of the American sailors killed in the Cole bombing—so it can hardly be assumed that the punitive damages awarded in that case,

5.   Post-Judgment Interest and Attorneys' Fees and Costs

The federal post-judgment interest statute provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court" and that such interest "shall be calculated from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of judgment."  28 U.S.C. § 1961(a).  The statute further provides that "[i]nterest shall be computed daily to the date of payment . . . and shall be compounded annually."  § 1961(b).  Because "[a]pplication of section 1961(a) is mandatory, not discretionary," *Schooley*, 2019 WL 2717888 at *79 (citations omitted), the Court awards Plaintiffs post-judgment interest at the statutory rate.

Plaintiffs also request reasonable attorneys' fees and costs.  *See* Compl. ¶¶ 8.2(e), 8.3(g). However, the Court "is not aware of any statutory or other basis for the award of attorney's fees," *Kinyua v. Republic of Sudan*, 466 F. Supp. 3d 1, 13 (D.D.C. 2020), and Plaintiffs "have not provided any information regarding the fees and costs sought," *Schooley*, 2019 WL 2717888 at *79, so the request is denied.  *See also Mark v. Islamic Republic of Iran*, No. 20-cv-651, 2022 WL4103854, at *19 (D.D.C. Sept. 8, 2022).

---

which were also applied based on the multiplier approach, amounted to sufficient punishment or deterrence.  Second, and relatedly, because the Court also adopts the multiplier approach here, the punitive damage awards are "personal to plaintiffs" and therefore not "excessive" despite arising out of the same bombing as *Flanagan*.  *Id.*

**V.  CONCLUSION**

For the foregoing reasons, Plaintiffs' motions to substitute parties (ECF Nos. 22, 23) are

**GRANTED**; and it is

**FURTHER ORDERED** that Plaintiffs' Motion for Default Judgment (ECF No. 31) is

**GRANTED**.  As set forth for each Plaintiff in the attached Annex, Surviving Family Plaintiffs

are awarded $243 million in solatium damages, Navy Plaintiffs are awarded $188 million in pain

and suffering damages, and Immediate Family Plaintiffs are awarded $58 million in solatium

damages, and Plaintiffs are awarded $1,467,000,000 in punitive damages.  An order consistent

with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  July 29, 2024                                                RUDOLPH CONTRERAS
                                                                              United States District Judge

**ANNEX**

| | Plaintiff | | Compensatory Damages ($ million) | | Punitive Damages ($ million) | Total Damages ($ million) |
|---|---|---|---|---|---|---|
| | **Name** | **Category** [20] | **Pain & Suffering** | **Solatium** | | |
| 1 | Mona Gunn | SF | | 5 | 15 | 20 |
| 2 | Anton Gunn | SF | | 2.5 | 7.5 | 10 |
| 3 | Jamal Gunn | SF | | 2.5 | 7.5 | 10 |
| 4 | Jason Gunn | SF | | 2.5 | 7.5 | 10 |
| 5 | Avinesh Kumar | SF | | 8 | 24 | 32 |
| 6 | Preshilla Caprice Kumar | SF | | 5 | 15 | 20 |
| 7 | Theresa Embry | SF | | 5 | 15 | 20 |
| 8 | Hugh Palmer | SF | | 5 | 15 | 20 |
| 9 | Ollesha Smith | SF | | 2.5 | 7.5 | 10 |
| 10 | Jack Swenson | SF | | 2.5 | 7.5 | 10 |
| 11 | Diane McDaniels | SF | | 5 | 15 | 20 |
| 12 | Dominique McDaniels | SF | | 2.5 | 7.5 | 10 |
| 13 | Frederica Phoenix | SF | | 2.5 | 7.5 | 10 |
| 14 | Olivia Rux | SF | | 8 | 24 | 32 |
| 15 | Sarah Esquivel | SF | | 5 | 15 | 20 |
| 16 | Sharon Priepke | SF | | 5 | 15 | 20 |
| 17 | Connie Albright | SF | | 2.5 | 7.5 | 10 |
| 18 | Jeffrey McKee | SF | | 2.5 | 7.5 | 10 |
| 19 | Lorrie Triplett | SF | | 8 | 24 | 32 |
| 20 | Andrea Triplett | SF | | 5 | 15 | 20 |
| 21 | Savannah Triplett | SF | | 5 | 15 | 20 |
| 22 | Freddie Triplett | SF | | 2.5 | 7.5 | 10 |
| 23 | Kevin Triplett | SF | | 2.5 | 7.5 | 10 |
| 24 | Sharla Costelow | SF | | 8 | 24 | 32 |
| 25 | Michael Dillon Pritchard | SF | | 5 | 15 | 20 |
| 26 | Brady Costelow | SF | | 5 | 15 | 20 |
| 27 | Ethan Costelow | SF | | 5 | 15 | 20 |
| 28 | Dorothy Costelow | SF | | 5 | 15 | 20 |
| 29 | Joseph Costelow | SF | | 2.5 | 7.5 | 10 |
| 30 | Marion DiMauro | SF | | 2.5 | 7.5 | 10 |

[20] Surviving Plaintiffs are referred to with the notation "SF," and Navy Plaintiffs are referred to with the notation "N," and Immediate Family Plaintiffs are referred to with the notation "IF."

| | | | | | | |
|---|---|---|---|---|---|---|
| 31 | Carol Lynn DiMauro | SF | | 2.5 | 7.5 | 10 |
| 32 | Patricia Ryan | SF | | 2.5 | 7.5 | 10 |
| 33 | Etta Parlett | SF | | 5 | 15 | 20 |
| 34 | LeRoy Parlett Estate | SF | | 5 | 15 | 20 |
| 35 | Matthew Parlett | SF | | 2.5 | 7.5 | 10 |
| 36 | Hannah Leslie Latham Parlett | SF | | 2.5 | 7.5 | 10 |
| 37 | Kera Parlett Miller | SF | | 2.5 | 7.5 | 10 |
| 38 | Sandra Francis | SF | | 5 | 15 | 20 |
| 39 | Ronald Francis | SF | | 5 | 15 | 20 |
| 40 | David Francis | SF | | 2.5 | 7.5 | 10 |
| 41 | James Francis | SF | | 2.5 | 7.5 | 10 |
| 42 | Kathy Ann Brown | SF | | 5 | 15 | 20 |
| 43 | Kevin Roy | SF | | 2.5 | 7.5 | 10 |
| 44 | Sean Walsh | SF | | 2.5 | 7.5 | 10 |
| 45 | Deborah Swenchonis | SF | | 5 | 15 | 20 |
| 46 | Gary Swenchonis Sr. | SF | | 5 | 15 | 20 |
| 47 | Shalala Swenchonis | SF | | 2.5 | 7.5 | 10 |
| 48 | Patricia Wibberley | SF | | 5 | 15 | 20 |
| 49 | Thomas Wibberley | SF | | 5 | 15 | 20 |
| 50 | Toni Lewis | SF | | 2.5 | 7.5 | 10 |
| 51 | Noah Clodfelter | SF | | 5 | 15 | 20 |
| 52 | Simeona Santiago | SF | | 5 | 15 | 20 |
| 53 | Jaime Owens Estate | SF | | 8 | 24 | 32 |
| 54 | Isabella Owens | SF | | 5 | 15 | 20 |
| 55 | Jacqueline Saunders | SF | | 8 | 24 | 32 |
| 56 | Isley Saunders | SF | | 5 | 15 | 20 |
| 57 | Jocelyn Saunders | SF | | 5 | 15 | 20 |
| 58 | Matthew Saigger | N | 5 | | 15 | 20 |
| 59 | Tremane Lide | N | 5 | | 15 | 20 |
| 60 | Ryan Schmaltz | N | 6 | | 18 | 24 |
| 61 | Justin Crowe | N | 5 | | 15 | 20 |
| 62 | James Parlier | N | 5.5 | | 16.5 | 22 |
| 63 | Lori Austin | N | 5.5 | | 16.5 | 22 |
| 64 | Terry Duff | N | 6.5 | | 19.5 | 26 |

| 65 | Aaron Toney | N | 5.5 | | 16.5 | 22 |
|----|-------------|---|-----|--|------|----|
| 66 | Carl Wingate | N | 6 | | 18 | 24 |
| 67 | David Morales | N | 6 | | 18 | 24 |
| 68 | Edward Love | N | 5 | | 15 | 20 |
| 69 | Eric Williams | N | 6 | | 18 | 24 |
| 70 | Gina Baenziger | N | 5 | | 15 | 20 |
| 71 | Jeremy Stewart | N | 6.5 | | 19.5 | 26 |
| 72 | John Buckley III | N | 6 | | 18 | 24 |
| 73 | Rick Harrison | N | 5.5 | | 16.5 | 22 |
| 74 | Robert McTureous | N | 6 | | 18 | 24 |
| 75 | Kay Moore | N | 6 | | 18 | 24 |
| 76 | Corey Reier | N | 5 | | 15 | 20 |
| 77 | Jessica Kritzas | N | 6 | | 18 | 24 |
| 78 | Elroy Newton | N | 5 | | 15 | 20 |
| 79 | Eric Kafka | N | 5 | | 15 | 20 |
| 80 | Jamisha Davis | N | 5 | | 15 | 20 |
| 81 | Chauntavia Peterkin | IF | | 2.5 | 7.5 | 10 |
| 82 | Dwight Thompson | IF | | 2.5 | 7.5 | 10 |
| 83 | Latoya Brown | IF | | 1.25 | 3.75 | 5 |
| 84 | Christopher Nolf | N | 5 | | 15 | 20 |
| 85 | Gail Nolf | IF | | 2.5 | 7.5 | 10 |
| 86 | Gregory Nolf | IF | | 1.25 | 3.75 | 5 |
| 87 | Keith Lorensen | N | 6 | | 18 | 24 |
| 88 | Lisa Lorensen | IF | | 4 | 12 | 16 |
| 89 | Martin Songer | N | 5 | | 15 | 20 |
| 90 | Shelly Songer | IF | | 5 | 15 | 20 |
| 91 | Kathie Brister | N | 7 | | 21 | 28 |
| 92 | Andy Lopez | IF | | 5 | 15 | 20 |
| 93 | Rubin Smith Estate | N | 5 | | 15 | 20 |
| 94 | Sean Powell | N | 5 | | 15 | 20 |
| 95 | Kenya Powell | IF | | 2.5 | 7.5 | 10 |
| 96 | Steven Powell | IF | | 2.5 | 7.5 | 10 |
| 97 | Ashley Misch | IF | | 1.25 | 3.75 | 5 |
| 98 | Jeffrey Vinneau | N | 5 | | 15 | 20 |
| 99 | Linda Vinneau | IF | | 5 | 15 | 20 |
| 100 | Lauren Crago | IF | | 2.5 | 7.5 | 10 |
| 101 | Paul Abney | N | 6 | | 18 | 24 |
| 102 | Madeline Turlich-King | IF | | 2.5 | 7.5 | 10 |
| 103 | Amelia Thompson | IF | | 2.5 | 7.5 | 10 |
| 104 | Chadwick Atwood | N | 5 | | 15 | 20 |

| 105 | Gayla Wilson | IF | | 2.5 | 7.5 | 10 |
|---|---|---|---|---|---|---|
| 106 | Heather Nickell | IF | | 1.25 | 3.75 | 5 |
| 107 | Jason Phillips | N | 5 | | 15 | 20 |
| 108 | Mary Phillips-McNamara | IF | | 2.5 | 7.5 | 10 |
| 109 | Michael Russell | N | 6 | | 18 | 24 |
| 110 | Michelle Russell | IF | | 4 | 12 | 16 |
| 111 | Christian Russell | IF | | 2.5 | 7.5 | 10 |
| 112 | Karissa Teeter | IF | | 2.5 | 7.5 | 10 |
| **Total** | | | **188** | **301** | **1,467** | **1,956** |